Terry M. HOLMES, David Woodall, Gabriel J. Williams, Gabriel Contreras, Jr., April Harlow, Alfonso R. Rodriguez, Michael Brice, & Walter Widener, Jr.

v.

The STATE of Texas.

Nos. PD–0453–07 to PD–0460–07.

Court of Criminal Appeals of Texas.

April 29, 2009.

Opinion on Rehearing Feb. 24, 2010.

Dissenting Opinion on Denial of Rehearing Sept. 15, 2010.

Vernard Solomon, Marshall, for Appellant.

Al Davis, Asst. Crim. Dist. Atty., Marshall, Jeffrey L. Van Horn, State's Attorney, Austin, for State.

WOMACK, J., delivered the opinion of the Court, in which MEYERS, PRICE, JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

The appellant David Woodall was charged with driving while intoxicated.[1] The County Court at Law found him guilty. The Court of Appeals reversed the conviction and remanded the case.[2]

Relying on its decision in Woodall's case, the Court of Appeals reversed the judgments of conviction in seven other driving-while-intoxicated cases from the same trial court and remanded them for further proceedings.[3] We consolidated the eight

1. See PENAL CODE § 49.04.

2. *See Woodall v. State*, 216 S.W.3d 530 (Tex. App.-Texarkana 2007).

3. *Holmes v. State*, No. 06–06–105–CR, 2007 WL 702739; *Williams v. State*, No. 06–06–107–CR, 2007 WL 746157; *Contreras v. State*, No. 06–06–108–CR, 2007 WL 703114; *Harlow v. State*, No. 06–06–109–CR, 2007 WL

cases and granted the State's petitions for discretionary review.

In the case of David Woodall, we shall reverse the Court of Appeals' judgment and affirm the judgment of the trial court. In the other seven cases we shall affirm the judgments of the Court of Appeals.

The distinction between Woodall's case and the others is the preservation of error for appeal.

### Woodall's Case

Just before the jury trial of Woodall's case began, the State, relying on a ruling recently made by the same trial court in a case that is not before us,[4] made an oral request that the trial court take judicial notice of the underlying science of the Intoxilyzer 5000 (a machine which tests samples of breath for alcohol content). Defense counsel objected, arguing:

> My cross-examination of an expert from the State of Texas in regard to the Intoxilyzer 5000 goes to testing the techniques and the principles and the application by the machine of the recognized breath testing science. And to deny me the right to go into question [sic] the techniques and the application done by the machine prevents the Defendant from presenting a defense. And it prevents us the right of due process of law because what the Court is doing with that kind of a ruling is creating something that the legislature has refused to do for the past 25 years and that is create a per se guilt issue on intoxication based upon breath testing.

In ruling on the motion in favor of the State, the trial court said:

> Well, I think admissibility is the ultimate test of reliability. And I have read cases in which it appears to me that the Courts have upheld and found that reliability of the techniques used by the Intoxilyzer 5000. The test for admissibility has long been a very simple test, which appears to me, among—also along with reading those other cases, that the Courts have long upheld the reliability of this particular machine.
>
> Now, absent some expert testimony that would indicate some problems with the machine—and we have tried many, many, many cases involving the Intoxilyzer 5000 and I have never heard not one shred of evidence from an expert witness that would indicate any problem with the machine—I'm going to grant your application just like I did in the other case.

Defense counsel sought clarification:

[DEFENSE COUNSEL]: Judge, so I know for sure, what you are ordering me is not to question the expert in regard to the principles of the Intoxilyzer and how it applies the rules of science in regard to attempting to apply the science of breath testing. In essence, I always have a question about the lack of the—or the ability of the machine to correlate the temperature. I have a—

[TRIAL COURT]: What temperature?

[DEFENSE COUNSEL]: The temperature of the breath sample.

[TRIAL COURT]: All right.

702770; *Rodriguez v. State*, No. 06–06–110–CR, 2007 WL 702803; *Brice v. State*, No. 06–06–111–CR, 2007 WL 702879; *Widner v. State*, No. 06–06–112–CR, 2007 WL 703095. All the opinions were delivered on March 9, 2007, and they were not designated for publication.

4. *Barfield v. State*, No. 06–06–00090–CR, 2007 WL 188658, 2007 Tex.App. LEXIS 566 (Tex.App.-Texarkana Jan.26, 2007) (not designated for publication).

[DEFENSE COUNSEL]: You are saying that I can't go into that?

[TRIAL COURT]: That's right.

[DEFENSE COUNSEL]: I always question as to the way the tube is heated, the way the breath is heated and there being no correlation to that. I can't go into that?

[TRIAL COURT]: That's correct.

[DEFENSE COUNSEL]: I've always contested the temperature in the simulator and the law, Henry's Law, as it applies to the simulator. I can't go into that?

[TRIAL COURT]: Only if there is some indication that there is something wrong—if the test before and after the admissibility test show there is something wrong with the machine. But you are right.

[DEFENSE COUNSEL]: Okay.

[TRIAL COURT]: If the evidence is that they tested it before the test in question and tested it after the test in question and it was working both times and the evidence is that it was working that day, you are correct.

[DEFENSE COUNSEL]: So if they present an expert, in his opinion, that says that the machine has valid operation to apply to principles of breath testing, I cannot question that expert in the principles and application of the breath testing science. Is that what the Court is saying?

[TRIAL COURT]: That is correct.

Defense counsel again objected to the court's ruling, and his objection again was overruled. Defense counsel then asked for a running objection and stated that he needed to perfect a bill. The judge suggested he do so by making a statement into the record of what he would prove. Defense counsel replied that he would be glad to do it later.

But he never did.

In the trial before the jury, the State introduced evidence of the arresting officer's testimony that he pulled Woodall's vehicle over after seeing it weave and swerve, that he smelled alcohol on Woodall's breath, and that Woodall had red and watery eyes. The officer also testified that he conducted various field-sobriety tests at the scene and again at the jail, and that Woodall performed poorly in those tests. The State then played videotapes of the sobriety tests for the jury. Finally, the officer described the procedure involved in operating the Intoxilyzer 5000 and stated that Woodall had submitted to a breath test. But when the State offered a copy of the report which contained the results of the tests, the trial court sustained Woodall's objection that the State had failed to lay a proper predicate. The officer never testified to the results, and the trial court never admitted them into evidence.

After the arresting officer's testimony and a recess for lunch, the defense counsel said, "I would like to also—and I'll keep it short—make a proffer in regards to what questions I would have asked if permitted to do so."

The Court said, "We've been talking about a potential resolution of the case." A trial without a jury began.

The defense counsel moved "for permission to cross-examine any expert called on behalf of the State of Texas concerning the reliability of the Intoxilyzer 5000. And more in particular into the techniques and application of the techniques and principles of breath testing applied by the Intoxilyzer 5000."

The Court overruled and denied the motion.

The appellant Woodall withdrew his plea of not guilty and pleaded no contest pursu-

ant to a plea agreement. After the trial court found him guilty, the appellant Woodall appealed the denial of his oral motion for cross-examination.

### The Other Cases

Each of the other seven appellants' cases came to court after Woodall's trial. Each appellant was charged with driving while intoxicated. Before trial, each appellant filed a motion to cross-examine the State's expert on the operation of the Intoxilyzer 5000. Included in each motion was a list of eight "areas of concern about the internal workings of the Intoxilyzer 5000:

"1. The simulator, which the state presents as proof that the machine is working properly on the date in question, is based on Henry's Law. It requires that the simulator is maintained at a constant temperature, in a closed container, and at a constant pressure. It simulates a person which is offered to give a sample of their breath [sic]. The human body is not a closed container which prevents a constant pressure and the temperature of the breath is unknown to the machine.

"2. The partition ratio between the gas above the fluid and the substance in the fluid is incorrect as it relates to the partition ratio assumed by the machine to be the that [sic] of the subject.

"3. The machine heats certain parts that are used to produce a result including the collection chamber to between 115 deg. To [sic] 145 deg. which effects [sic] the breath sample by producing a false high.

"4. The temperature of the human breath is unknown to the machine and has no way [sic] of measuring the same in order to give an accurate result. If the temperature of the breath is above 34 deg. The [sic] results will be a false high.

"5. A rise of three (3) deg. C will increase the results by a false high of .02. A body temperature of 37 deg. C is 98.6 deg. F. which is normal body temperature.

"6. The Intoxilyzer is not specific to Ethel [sic] alcohol and that others substances [sic] will indicate a false high in the results.

"7. The Intoxilyzer has a slop or tolerance or error factor of .02.

"8. That if the temperature of the simulator is unknown to the operator he would not be able to predict the simulator results."

The trial court denied each motion.

Each appellant entered a no-contest plea without a trial, and no evidence was heard in the seven cases. The trial court found each of the seven appellants guilty.

### The Appeals

On appeal, Woodall and the seven other appellants argued that the trial court erred in denying their motions to cross-examine the State's breath-test expert about the operation of the Intoxilyzer 5000.[5] The Court of Appeals held that the appellants had preserved the error for review, that complete denial of the right to cross-examine was error, that the right to present a defense is a fundamental element of due process of law, and that a violation of that right amounts to constitutional error.[6] The Court also concluded that it could not determine beyond a reasonable doubt that the errors did not con-

---

5.  *See Woodall,* 216 S.W.3d, at 531–33.

6.  *Id.,* at 534–37.

tribute to the convictions, pursuant to Rule of Appellate Procedure 44.2(a).[7]

The State petitioned for, and we granted, discretionary review of three issues. Two of them concerned preservation of error: Must the appellate record demonstrate the substance of the testimony that the breath-test expert would have given? Must the appellate record show the results of the Intoxilyzer tests?

The third issue had to do with harm: Was Rule of Appellate Procedure 44.2(a)'s harmless-error standard for constitutional error the correct standard?

### Preservation of Error

■■ Rule of Evidence 103(a)(2) limits the scope of issues which may be appealed when evidence is limited or excluded. "Error may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence was made known to the court by offer, or was apparent from the context within which questions were asked."[8] The offer of proof may be in question-and-answer form or in the form of a concise statement by counsel.[9] "An offer of proof to be accomplished by counsel's concise statement must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible."[10] The primary

purpose of the offer of proof is to enable an appellate court to determine whether the exclusion was erroneous and harmful.[11] A secondary purpose is to permit the trial judge to reconsider his ruling in light of the actual evidence.[12]

This court has recognized a distinction between the general rule in Rule 103(a)(2) and the case in which the defendant is not permitted to question a State's witness about matters that might affect the witness's credibility.[13]

■■ In the latter case, "the defendant need not show what his cross-examination of the witness would have affirmatively established; he must merely establish what general subject matter he desired to examine the witness about during his cross-examination and, if challenged, show on the record why such should be admitted into evidence."[14] In such a case the trial court's ruling has prevented a defendant from questioning a State's witness about subject matters which affect the witness's credibility, that is, matters which might show malice, ill feeling, ill will, bias, prejudice, or animus.[15]

The distinction between these kinds of cases may have been blurred by the similarity of language in two expressions: "the credibility of a witness's testimony" and "a witness's credibility." The former expression refers to the substance of the evidence; the latter refers to personal characteristics of the witness.

---

7. *Id.*, at 537.

8. R. Evid. 103(a)(2).

9. R. Evid. 103(b); *Warner v. State,* 969 S.W.2d 1, 2 (Tex.Cr.App.1998).

10. *Warner,* 969 S.W.2d, at 2.

11. McCormick on Evidence § 51 (4th ed. 1992). *Accord,* Steven Goode et al., 1 Texas

Practice—Guide to the Texas Rules of Evidence: Civil and Criminal § 103.3 (1993).

12. *Ibid.*

13. *Virts v. State,* 739 S.W.2d 25, 29 (Tex.Cr. App.1987).

14. *Ibid.*

15. *Ibid.*

The blurring perhaps began when we paraphrased language from one decision ("certain subject matters that might [show] malice, ill feeling, ill will, bias, prejudice, or animus")[16] in *Virts v. State* as "certain general subject[s] that might affect the witness's credibility."[17] The *Virts* opinion, despite its initial short-hand, went on to state what we meant by "certain general subject[s] that might affect the witness's credibility," namely, those subjects that might "reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to any impairment or disability affecting the witness's credibility."[18]

Taken out of context, however, the phrase left open the door to more confusion, which occurred in this court when Judge Teague, in citing *Virts* in a dissenting opinion, substituted "credibility of the witness's testimony" for "witness's credibility."[19]

We hope in this case to return to the correct statement of the distinction between Rule 103(a)(2)'s requirement for preservation of error and the narrow exception for subject matters which affect the witness's credibility—that is, matters which might show malice, ill feeling, ill will, bias, prejudice, or animus.

The Court of Appeals said in this case, "Under many circumstances, the statements by counsel might not be sufficient to adequately inform the trial court about the substance of the evidence he wanted to offer. However, in this instance, it is apparent that counsel and the court both understood the broad picture of the questions counsel sought to propound and the line of questioning upon which his arguments were based."[20] Citing *Virts*, the Court of Appeals declared, "When a trial court excludes evidence designed to call into question *the credibility of a witness's testimony*, the defendant has less rigid requirements to preserve error for appeal."[21] We disagree with this statement of law, and we disagree that the facts of this case fall within the exception.

■ The essence of *Virts* is that "the right of cross-examination by the accused of a testifying State's witness includes the right to impeach the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to any impairment or disability affecting the witness's credibility."[22] There, the trial judge prevented the defendant from cross-examining a State's witness regarding the witness's mental health.[23] On appeal, this court found that, based on a sufficiently estab-

16. *Koehler v. State*, 679 S.W.2d 6, 9 (Tex.Cr. App.1984).

17. *Virts*, 739 S.W.2d, at 29. *Cf. Koehler*, 679 S.W.2d, at 9 ("any question asked of a witness on cross-examination, *which might have a tendency to affect the witness' credibility*, is always a proper question") (emphasis in original).

18. *Virts*, 739 S.W.2d, at 29.

19. *Wilford v. State*, 739 S.W.2d 854, 866 (Tex. Cr.App.1987) (Teague, J., dissenting).

20. *Woodall*, 216 S.W.3d, at 535.

21. *Id.*, at 535 (emphasis added) (citing *Virts*, 739 S.W.2d, at 29; *Koehler*, 679 S.W.2d, at 9).

22. *Virts*, 739 S.W.2d, at 29. *See Koehler*, 679 S.W.2d, at 9. *See also Harris v. State*, 642 S.W.2d 471, 479–80 (Tex.Cr.App.1982) (trial court's refusal to allow effective cross-examination of a State's witness to establish her bias or motive in testifying against the defendant violated the defendant's right to confrontation).

23. *Virts*, 739 S.W.2d, at 28.

lished record, the witness's mental illness was relevant to her credibility, and that the trial court erred in excluding it as evidence.[24]

*Virts* dealt specifically with evidence affecting the witness's credibility (that is, relevant evidence used to impeach the witness); it did not deal with evidence affecting the substance of a witness's testimony. Applying *Virts*, however, the Court of Appeals reasoned in this case: "Clearly, questions [to the State's expert] about the claimed shortfall in the machine's capabilities ... could have impaired the [State's expert's] credibility and would have been directed at raising doubts that the results about which he was testifying were accurate."[25] We disagree.

█ While there might be little distinction between a witness's credibility and the substance of the witness's testimony in some cases, we find no such showing here. To the contrary, we find a clear distinction, because any shortfall in the machine's capabilities would raise doubts about the substance of the witness's testimony, but not about the witness's credibility. Even if evidence were presented that cast doubt on the Intoxilyzer 5000, this would not necessarily mean that the State's expert had bias or prejudice, for example, in testifying against the appellant Woodall. Surely all cross-examination, to some extent, is directed at "raising doubts" for the trier of fact about the witness's direct testimony. But to equate the two would allow the exception to swallow Rule 103(a)(2) entirely.

The Court of Appeals' broad interpretation of the exception from *Virts* does not accurately reflect this court's intent in promulgating Rule 103(a)(2) or in deciding *Virts* and the line of cases that came be-

fore it, and we decline to stray from our narrow intent today. Instead, we offer this clarification of the exception: where the defendant, in cross-examining a State's witness, desires to elicit subject matters that tend to impeach the witness's character for truthfulness—for example, to show malice, ill-feeling, ill-will, bias, prejudice, or animus on the part of the witness toward the defendant—in order to preserve the issue for appellate review, he is not required to show that his cross-examination would have affirmatively established the facts sought, but merely that he desired to examine the witness with regard to those specific subject matters that tend to impeach the witness during his cross-examination.

Although Woodall showed an intent to call into question the underlying science of the Intoxilyzer 5000, this intent does not amount to an intent to impeach the witness's truthfulness, as opposed to the substance of the witness's testimony. Because the appellant Woodall failed to "merely establish" that the "general subject matter" of his proffered evidence would be used to impeach the expert, and not the substance of the expert's testimony, his case is controlled by the requirements of Rule of Evidence 103(a)(2) rather than the exception for impeachment of a witness's credibility. Woodall failed to preserve his complaint for review by making a record of the substance of the evidence he wished to present as Rule 103(a)(2) required.

The only indications we have from the record regarding the substance of the evidence that Woodall wished to offer are three statements he made to the trial judge during his objection to the State's oral motion: (1) "the ability of the machine to correlate the temperature"; (2) "the

**24.** *Id.,* at 28–30.

**25.** *Woodall,* 216 S.W.3d, at 535.

way the tube is heated, the way the breath is heated and there being no correlation to that"; and (3) "the temperature in the simulator and the law, Henry's Law, as it applies to the simulator." Even if we assume that these statements from defense counsel are adequate to inform this court of the questions he wished to pose to the State's expert witness, we have no indication from the record as to what the State's expert's answers might have been. In fact, the only indication we do see in the record is from the trial judge, who stated, "I have never heard not one shred of evidence from an expert witness that would indicate any problem with the machine." Unlike Virts, who showed from the record an intent to impeach the witness based on the witness's history of mental illness, the appellant Woodall has made no showing in the record of an intent to impeach the State's expert's credibility, nor do we have any indication that this was even his intent. His only intent, as we see it, was to call into question the underlying science of the Intoxilyzer 5000. This, however, would merely call into question the substance of the expert's testimony, not the expert's credibility.

What the record does suggest to us is that, after many trials, the trial court and the attorneys in this case were familiar with defense counsel's usual questions and the usual answers that the State's expert witness had given in other trials regarding the Intoxilyer 5000.[26] This court, however, is not privy to such information. Here we must have what Rule 103(a)(2) requires: a record that shows the excluded evidence so that we can judge its admissibility and determine whether the trial court abused its discretion by excluding it.

When the defense attorney failed to "perfect a bill" or to make a statement of what he would prove, as he told the trial court he would do, he failed to satisfy Rule 103(a)(2). Counsel's statements are not a reasonably specific summary of the evidence offered. Because the substance of the evidence has not been made known to us from the record, and because the substance of the evidence is not apparent to us from the record, the appellant Woodall has failed to comply with Rule 103(a)(2). Thus, we are unable to judge the admissibility of the excluded evidence or determine whether the trial court abused its discretion by excluding it. We find that the error has not been adequately preserved for this or any appellate court.

We reverse the ruling of the Court of Appeals in the *Woodall* case and affirm the judgment of the trial court.

Because the record in each of the seven companion cases contains a showing, in the form of a written motion and included proffer for purposes of Rule 103(a)(2), which is different from that in the appellant Woodall's case, we affirm the judgments of the Court of Appeals in those cases.

KELLER, P.J., concurred in the judgment.

### OPINION ON STATE'S MOTION FOR REHEARING

MEYERS, J., delivered the opinion of the Court in which KELLER, P.J., and WOMACK, JOHNSON, KEASLER, HERVEY, and HOLCOMB, JJ., joined.

The defendants in eight separate cases were charged with driving while intoxicated. In each case, the defendant filed a pretrial motion to cross-examine the State's expert on the breath-testing ma-

---

**26.** *See Woodall,* 216 S.W.3d, at 534 ("The trial court's response was based, in large part, on earlier cases and arguments raised by the same counsel, and on the large number of other cases [the trial judge] had heard involving intoxilyzers.").

chine, the Intoxilyzer 5000. The trial court denied the motions, and the defendants entered pleas of no contest. Each defendant was found guilty. The trial court certified the defendants' right to appeal. All eight defendants appealed, and the court of appeals reversed and remanded the cases to the trial court.[1] The State filed a petition for discretionary review in each case. We consolidated the eight cases and granted the State's petition. We issued an opinion related to the preservation of error and affirmed the court of appeals in all of the cases except *Woodall*. In *Woodall*, we reversed the court of appeals, holding that the error was not preserved. *See Holmes, et al. v. State*, 2009 Tex.Crim.App. LEXIS 522. The State Prosecuting Attorney filed a motion for rehearing in the cases we affirmed, claiming that the issues presented in the State's grounds for review were distinct from the preservation of error issue discussed in our opinion. We granted the State's motion for rehearing and ordered rehearing on our own motion in *Woodall*. We will affirm the court of appeals.

## STATE'S ARGUMENT ON REHEARING

In its motion for rehearing, the State contends that the issue raised in this case is one of cognizability rather than preservation of error. The State argues that, even if the trial court erred in denying the defense motions, the defendants cannot get appellate relief unless they show that the erroneous ruling was used against them. However, because the defendants pleaded guilty,[2] there is very little appellate record from which to determine whether the trial court's ruling was used against them. This is what distinguishes this issue from preservation of error. The State concedes that the "concise statement by counsel" may have been sufficient to preserve the challenge to the trial court's ruling. However, it was not enough to show that the trial court's ruling excluding the evidence was used against the Appellants in connection with their guilty pleas.

The question here is whether the trial court's ruling that the defense could not cross-examine the expert on the Intoxilyzer induced the defendants to admit guilt. The State says that questions regarding the machine would not have been relevant because the results of the breath test were not entered into evidence. Therefore, excluding such questions could not be prejudicial. And, since the results of the breath testing were never admitted, the appellate

---

1. *Woodall v. State*, 216 S.W.3d 530 (Tex.App.Texarkana 2007); *Holmes v. State*, No. 06–06–00105–CR, 2007 WL 702739, 2007 Tex.App. LEXIS 1854 (Tex.App.Texarkana, March 9, 2007) (Mem. op., not designated for publication); *Williams v. State*, No. 06–06–00107–CR, 2007 WL 746157, 2007 Tex.App. LEXIS 1855 (Tex.App.Texarkana, March 9, 2007) (Mem. op., not designated for publication); *Brice v. State*, No. 06–06–00111–CR, 2007 WL 702879, 2007 Tex.App. LEXIS 1865 (Tex.App.Texarkana, March 9, 2007) (Mem. op., not designated for publication); *Harlow v. State*, No. 06–06–00109–CR, 2007 WL 702770, 2007 Tex.App. LEXIS 1858 (Tex.App.Texarkana, March 9, 2007) (Mem. op., not designated for publication); *Rodriguez v. State*, No. 06–06–00110–CR, 2007 WL 702803, 2007 Tex.App. LEXIS 1859 (Tex.App.Texarkana, March 9, 2007) (Mem. op., not designated for publication); *Widner v. State*, No. 06–06–00112–CR, 2007 WL 703095, 2007 Tex.App. LEXIS 1860 (Tex.App.Texarkana, March 9, 2007) (Mem. op., not designated for publication); *Contreras v. State*, No. 06–06–00108–CR, 2007 WL 703114, 2007 Tex.App. LEXIS 1857 (Tex.App.Texarkana, March 9, 2007) (Mem. op., not designated for publication).

2. The defendants pleaded no contest and were found guilty by the trial court without a trial. A plea of no contest has the same legal effect as a plea of guilty. *See* Code of Criminal Procedure Article 27.02(5).

court cannot determine that the evidence was actually used against the appellants in a way that caused them to enter guilty pleas.

## ANALYSIS

■ In the court of appeals, the Appellants argued that the trial court's denial of the Sixth Amendment right to cross-examination deprived them of the right to present a defense, which could be developed only through the process of questioning the State's expert. Because the trial court did not allow cross-examination of the State's expert, the defendants agreed to plea so that the evidence they were not allowed to question could not go before a jury. *See Woodall,* 216 S.W.3d at 535, "Woodall was not challenging the admissibility of the test results; rather, he sought to cross-examine the expert witness to raise doubts about the accuracy of the machine itself and, therefore, the weight the jurors should attribute to the results of the test it performed."

We acknowledge the State's assertions that the erroneous ruling cannot be connected to the defendants' pleas since the breath-testing results, about which the defense sought to cross-examine the expert, were not presented. And, that because the defendants entered into plea agreements rather than proceeding to trial, there is little in the appellate record to show that the erroneous ruling was used against the Appellants. However, what was excluded here was not simply the ability to question an expert-it was the right to present a defense.

In *Holmes v. South Carolina,* the Supreme Court stated, "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a mean-ingful opportunity to present a complete defense.'" 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (quoting *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); citations omitted). *See also California v. Trombetta,* 467 U.S. 479, 486, n. 6, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ("In related cases arising under the Sixth and Fourteenth Amendments, we have recognized that criminal defendants are entitled to call witnesses on their own behalf and to cross-examine witnesses who have testified on the government's behalf." (*citing Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967))). In the case before us, the trial court's ruling disallowing cross-examination of the State's expert witness violated the defendant's fundamental rights to a fair trial. The Supreme Court said in *Pointer v. Texas:*

> There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.

380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Because the denial of the right to present a defense is a violation of due process and results in constitutional error, we now turn to the harm analysis.

■ Under Texas Rule of Appellate Procedure 44.2(a), if the appellate record reveals a constitutional error, we must reverse a judgment of conviction unless we determine beyond a reasonable doubt that

the error did not contribute to the conviction or punishment. The State argues that the trial court's ruling was not used against the Appellants and did not induce their pleas. We disagree. In *Kraft v. State*, we determined that by contesting the defendant's motion, the State preserved the option to "use" the evidence against the defendant in a trial. We concluded that "this ruling undoubtedly contributed in some measure to the State's leverage in the plea bargaining process." 762 S.W.2d 612, 614 (Tex.Crim.App.1988). Similarly, in *McKenna v. State*, the defendant agreed to plead guilty after his motion was denied because the State preserved the option to use the contested evidence to establish the elements of the offense in a full-blown trial. 780 S.W.2d 797, 799 (Tex.Crim.App.1989). Here, we cannot determine beyond a reasonable doubt that the trial court's failure to allow the defendants to present a defense did not contribute to their decision to enter pleas, which resulted in their conviction and punishment. Soon after the trial court denied their pretrial motions to permit cross-examination, the defendants changed their pleas to no contest and were found guilty by the trial court. This indicates that the trial court's erroneous ruling was indeed a contributing factor in the defendants' convictions and punishments.

## CONCLUSION

The trial court erred in denying the defendants the right to cross-examine the expert. The trial court's erroneous ruling denied the defendants the right to present a defense, and without the ability to present a defense, the defendants were forced to plead guilty. Because we cannot determine that this violation of the defendants' due-process rights did not contribute to their convictions, we must reverse the judgment of the trial court.

The judgment of the court of appeals is affirmed and the causes are remanded to the trial court for further proceedings.

PRICE and COCHRAN, JJ., concurred.

### DISSENT TO DENIAL OF STATE'S SECOND MOTION FOR REHEARING

MEYERS, J., joined by KELLER, P.J, and KEASLER and HERVEY, J.J.

I authored the opinion on the State's first motion for rehearing. I now believe that opinion, as well as the Court's opinion on original submission should be withdrawn because neither opinion addressed the issue raised all along by the State in its petition for discretionary review and its rehearing motions—whether these cases were cognizable for a review by the court of appeals [1]—and both opinions fail to address the State's repeated claim that this case is like *McGlynn v. State*, 704 S.W.2d 18 (Tex.Crim.App.1982)(opinion on reh'g).

A blueprint for addressing the cognizability question was laid out by this Court in *Gonzales v. State*, 966 S.W.2d 521 (Tex. Crim.App.1998). The test set out in *Gonzales* is based upon the two cases relied upon by the parties before us now: *McGlynn* and *Kraft v. State*, 762 S.W.2d 612 (Tex.Crim.App.1988). The State has contended all along that this case is like *McGlynn*; appellant has argued that this case is like *Kraft*. Before discussing *Gonzales*, therefore, it makes sense to first discuss *McGlynn* and *Kraft*.

Both cases involved a defendant's appeal, in a negotiated plea case, from the

---

1. In its second opinion on rehearing, the Court did address whether "the trial court's ruling" was "used" against appellants, but that discussion was part of a harm analysis conducted under 44.2(a); it was not an analysis of cognizability.

trial court's denial of a pretrial motion to suppress evidence. *McGlynn* involved an alleged Fourth Amendment violation, while *Kraft* concerned an alleged Fifth Amendment violation. In *McGlynn*, the defendant was arrested for aggravated assault and later charged with possession of a controlled substance, methylphenidate. 704 S.W.2d at 19. She filed a pretrial motion to suppress evidence of "a quantity of a substance alleged to be methylphenidate" which was seized from her purse incident to her arrest. At the hearing on the motion, the arresting officer conceded that he could not tell whether the pills he seized were controlled substances. The trial court denied the motion, and the defendant pled guilty. The issue before this Court was "what must the record show about the 'evidence' the trial court found was admissible, but which was not actually admitted, in order for an appellate court to exercise its jurisdiction" to address the validity of the search and seizure.[2] *Id.* at 19–20. While the officer suspected that the pills were contraband, there were multiple kinds of pills and he had "no idea" what kind he was looking at when he seized the bottle. This record simply did "not show that anything the officer seized was methylphenidate, much more that it was the same methylphenidate, to which [the defendant] pleaded guilty of possessing." The Court noted that without some demonstration in the record as to the sub-

stance seized, the issue became an academic exercise in determining whether the seizure was violative of either constitution. Under the Exclusionary Rule, however, " 'the issue is not the abstract propriety of the police conduct, but the admissibility against [the defendant] of the evidence uncovered by the search and seizure.' " *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Thus, the Court held that "unless and until we are confident about what fruits of a search have somehow been used, the Court need not decide whether the search was constitutionally permissible." *Id.* at 21.

In *Kraft*, the defendant pled nolo contendere to misdemeanor DWI and appealed the trial court's denial of his pretrial motion to suppress the audio portion of his DWI videotape, in which he was interrogated without counsel. 762 S.W.2d at 613. Relying on *McGlynn*, the State contended that the tape was essentially exculpatory and therefore it would not have sought to "use" that evidence against the defendant in any event. This Court agreed at the outset that the principles in *McGlynn* would rationally apply in the context of a motion to suppress based on alleged Fifth Amendment violations. The Court noted that, unlike *McGlynn*, the record in Kraft revealed the "fruits" that were allegedly "used" against the defendant. The videotape was admitted into the record. Thus, the issue presented in *Kraft* was one that

---

**2.** Certainly, we have held that "a defendant is not required to have the evidence which he sought to suppress admitted in order for the court of appeals to address the merits of an appeal challenging denial of a pretrial motion to suppress." *Gonzales*, 966 S.W.2d at 524 (citing *Kraft; McKenna*). But there must be something in the record on which the appellate court can make an assessment of the matter:

> [T]he appellate record will not contain a transcription of the notes of the court reporter reflecting *evidence* adduced at trial—

only a record of *testimony* and, perhaps, exhibits prior elicited at the hearing on a pretrial motion to suppress, as in the case at bar. Accordingly, it is the record of germane testimony and exhibits, if any, perfected for and brought forward on appeal which will inform an appellate determination of the matter raised by written motion prior to trial—even though that record had not been admitted in some fashion as *evidence* at the guilty plea.

*McGlynn*, 704 S.W.2d. at 20 (emphasis in original).

was never reached in *McGlynn:* whether the fruits had "somehow been used." *Id.* at 614. Although the tape was not inculpatory because it did not establish intoxication, the Court nonetheless held it had been "used" by the State as leverage in the plea bargain.[3] Thus, the Court held the "fruits" at issue in *Kraft* were indeed "somehow ... used" against the defendant.

The principles from *McGlynn* and *Kraft* were fashioned into a two-step inquiry by the Court in *Gonzales v. State,* 966 S.W.2d 521 (Tex.Crim.App.1998). Gonzales was charged with DWI and pled no contest after his pretrial motions to suppress evidence, which included his blood test results, were denied. This Court granted review to decide whether the Court of Appeals erred in holding that it need not address whether a blood test was taken in violation of Gonzales's rights because the results of the test were never admitted into evidence. The Court established a

two-step inquiry which "appellate courts must use ... when deciding whether to address the merits of a claim regarding the trial court's denial of a pretrial motion to suppress evidence prior to a guilty plea":[4]

> First, the appellate court must identify "the fruits" that the trial court held would not be suppressed. *McGlynn,* 704 S.W.2d at 21. Second, the appellate court must determine that these fruits have "somehow been used" by the State. *Kraft,* 762 S.W.2d at 613–14. If it is not clear from the testimony and exhibits what "the fruits" are, then the appellate court need not address the merits of the claim. Likewise, if the fruits have not "somehow been used" by the State, then the appellate court need not address the merits of the claim.

*Id.* at 524.[5]

*Gonzales, Kraft* and *McGlynn,* all involved appeals from a ruling on a pretrial

---

**3.** The Court explained how the tape, although not inculpatory, was "used" in obtaining the appellant's plea:

> In contesting appellant's motion to suppress and obtaining a ruling that the videotape was admissible in its entirety, the State preserved the option to "use" appellant's statement as part or all of its evidence going to establish the above elements in a full-blown trial. This ruling undoubtedly contributed in some measure to the State's leverage in the plea bargaining process; the more relevant evidence appellant knows could be marshalled against him, the more preferable would appear his option to relinquish constitutional rights of trial and confrontation in exchange for a favorable punishment recommendation. Thus, we may presume that at least to some extent the State has "used" the contested evidence to obtain appellant's plea.

*Kraft,* 762 S.W.2d at 614. The Court held that "so long as it may be concluded that particular evidence the accused maintains should have been suppressed pursuant to a motion raising Fourth or Fifth Amendment violations would in *any* measure inculpate the accused, that evidence has been 'used' against

him in securing his misdemeanor conviction, and hence, the appellate court should entertain the merits of his appeal." *Id.* at 615.

**4.** While this Court has not had another occasion to apply the test it established in *Gonzales,* it is routinely applied by the courts of appeals. *See, e.g., Miles v. State,* 194 S.W.3d 523, 526 n. 2 (Tex.App.-Houston [1st Dist.] 2006), *aff'd,* 241 S.W.3d 28 (Tex.Crim.App. 2007); *Brennan v. State,* 140 S.W.3d 779, 781 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd); *Hughes v. State,* 7 S.W.3d 880, 882–83 (Tex.App.-Amarillo 1999).

**5.** The Court remanded to the court of appeals to address the two questions. On remand, the court of appeals held that it could not identify from the record the "fruits" of the alleged unlawful search and seizure. *Gonzales v. State,* 977 S.W.2d 189, 191 (Tex.App.-Austin 1989, pet. ref'd). Although the testifying DPS trooper stated that he took the defendant's blood specimen to the DPS lab, the record does not show that it was analyzed or what the results were. *Id.* at 190. The defendant pointed to the State's allegations that he

motion to suppress evidence. This case involves appeals from rulings on pretrial motions to cross-examine a State's witness. The critical similarity is that they all involve a ruling on a pretrial motion which was appealed under Rule 25.2(a)(2), or a former version of that Rule. I see no reason why the same cognizability standard which applies to a plea-bargaining defendant who appeals a ruling on a pretrial motion to suppress, would not apply to a plea-bargaining defendant who appeals a ruling on a pretrial motion to cross-examine a witness. I believe *Gonzales* applies here.

Before applying *Gonzales* to this case, a brief review of the facts is in order. This case is a consolidation of eight DWI cases in which the State alleged both theories of intoxication (per se and loss of faculties) in each case. In seven of the cases (the "seven companion cases"), the defendants pled guilty immediately after denial of their pretrial motions to cross-examine the State's expert regarding the science underlying the Intoxilyzer 5000. Woodall's case went to trial and State Trooper Redden testified about the operation of the intoxilyzer. However, Woodall's intoxilyzer results were not admitted into evidence because his objection to them was sustained. Redden was not allowed to testify to appellant's results. Woodall pled guilty after Redden testified.

Analyzing the State's claim under *Gonzales*, the first task is to identify the "fruits." In the case of a motion to suppress evidence, the "fruit" is generally physical evidence (e.g., drugs, a weapon, stolen property) or at least clearly identifiable evidence (e.g., a written statement) that the defendant wanted suppressed. It

bears repeating here that the instant cases did not involve typical motions to suppress with clearly identifiable evidence. These cases did not involve motions to suppress at all. Rather, these cases concerned pretrial motions to allow cross-examination of a State's witness during trial. The character of testimony, and especially proposed cross-examination, is more elusive than physical evidence because its nature depends in large part upon its context and the manner in which the trial might unfold. The Supreme Court has commented on the difficulties associated with assessing a pretrial ruling related to testimony or evidence that has not been presented in the context of a trial that has played out. In *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), the Supreme Court held that a trial court's overruling of a motion *in limine* which sought to preclude the government from using a prior conviction to impeach the defendant if he testified, was not reviewable unless the defendant testifies because it was too fraught with speculation. Indeed, the Court noted that in order to assess the trial court's ruling, the reviewing court would have had to speculate about the precise nature of the defendant's testimony, whether the trial court's ruling would have remained the same or would have changed as the case unfolded, whether the government would have sought to impeach the defendant with the prior conviction, whether the accused would have testified in any event, and whether any resulting error in permitting impeachment would have been harmless. *Id.* at 41–42; *see also Jackson v. State,* 992 S.W.2d 469, 479 (Tex.Crim.App.1999)(discussing *Luce* ).

---

had an alcohol concentration of "0.10 or more," but the court declined to consider allegations in a charging instrument as evidence. Because it could not identify the

"fruits," the court was unable to determine that the alleged "fruits" had "somehow been used" by the State. *Id.* at 191.

No less speculation would have to occur here in order for a reviewing court to attempt to assess the trial court's ruling regarding the proposed cross-examination. In the seven companion cases, the general content of the proposed cross-examination was outlined by all seven appellants in their written motions to cross-examine, as pertaining to eight "areas of concern about the internal working of the Intoxilyzer 5000." In order to give context or relevance to this proposed line of questioning, however, the reviewing court would have to assume that the State would have decided to call an expert, that the expert would have testified to the appellants' breath test results, that such testimony would have been held admissible, and that the appellants' breath test results would in fact have been incriminating.[6] And none of this speculation even approaches whether any impeachment of the expert might have been harmless. The reviewing court has no way of knowing how the expert would have responded to the cross-examination. In Woodall's case, while we don't know the precise content of the proposed cross-examination, we know more about its context and relevance in relation to the case because the State did call its expert, Dennis Redden, to testify, and he did testify about the Intoxilyzer 5000. However, Redden did not testify to Woodall's breath test results; therefore, we can actually conclude that any cross-examination regard-

ing the Intoxilyzer 5000 would have been irrelevant, at least at that point, given that Woodall's breath test results were not admitted. It's possible the State would have focused on a theory of intoxication by loss of faculties if the trial had continued.[7] Indeed, it's possible that the evidence was strong enough in any of the eight cases for the State to choose to proceed on a theory of intoxication by loss of faculties. We simply don't know.

On this record, the precise nature of the barred cross-examination in the context of these cases is unknown. *See Gonzales; cf. Luce,* 469 U.S. at 41. Because "it is not clear from the testimony and exhibits what 'the fruits' are," the court of appeals erred to address the merits of appellants' claims. *See Gonzales; McGlynn.* Given that the "fruits" cannot be identified, the question of whether those fruits have "somehow been used" by the State is not reached. *See McGlynn.* I would hold the issue was not cognizable for appeal. *Id.*

Because I believe the Court's previous opinions have not adequately addressed the State's claims, and that this would make a difference to the ultimate outcome in these cases as demonstrated in this opinion, I dissent to the Court's denial of the rehearing motion.

---

6. Indeed, in holding that the accuracy and reliability of the intoxilyzer machine was a matter relevant to an issue in the case (such that barring related cross-examination was a violation of the right to present a defense), the court of appeals apparently made all of these critical presumptions, at least in the seven companion cases—that appellants' breath test results were all admissible, that they were all incriminatory, and that the State would have called an expert who would have testified to the test results. It would have been necessary to make such presumptions because it is the admission of breath test results as incrimina-

ting evidence that gives the intoxilyzer machine relevance to the case.

7. There was evidence to support such theory. Redden testified that he pulled Woodall's vehicle over after observing it swerving and weaving, that he smelled alcohol on Woodall's breath, and that Woodall had red, watery eyes. Redden further testified that he conducted field sobriety tests at the scene and again at the jail, and Woodall performed poorly. The State also played videotapes of the sobriety tests for the jury.