

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-23-00149-CV
_____

IN THE MATTER OF: H.R.-N., A CHILD

On Appeal from the 98th District Court
Travis County, Texas
Trial Court No. J38,767; PID 096835, Honorable Rhonda Hurley, Presiding

February 27, 2024

MEMORANDUM OPINION

Before QUINN, C.J., and DOSS and YARBROUGH, JJ.

Via an original petition filed in May 2021, the State alleged Appellant, H.R.-N., a juvenile, engaged in delinquent conduct by murdering R.A.D., also a juvenile.[1] The original petition was approved for determinate sentencing by a Travis County grand jury on June 23, 2021.[2] Subsequent petitions were filed that added allegations of tampering

_____

[1] Because the decedent was a minor at the time of death we will refer to him by initials. *See* TEX. R. APP. P. 9.8(c)(2).

[2] *See* TEX. FAM. CODE ANN. §§ 53.04, 53.045(d); *In re X.A.*, No. 01-19-00227-CV, 2020 Tex. App. LEXIS 425, at *1 n.2 (Tex. App.—Houston [1st Dist.] Jan. 16, 2020, orig. proceeding) (mem. op.) ("The Texas Legislature created a system for prosecuting juvenile offenders for certain violent offenses and this is called the determinate sentence system. To invoke this system, the prosecutor must obtain grand jury approval of a juvenile court petition charging one of the covered offenses. If the petition is approved and certified to the juvenile court, the case proceeds to adjudication and disposition. If the juvenile is found

with physical evidence and abuse of corpse. The consolidated allegations were tried to a jury in November 2022, who found Appellant engaged in delinquent conduct by committing murder, tampering with physical evidence, and abusing a corpse. Following a disposition hearing the next month, the trial court committed Appellant to the care, custody, and control of the Texas Juvenile Justice Department for 15 years for murder; indeterminate sentences were imposed for the two other offenses tried. Appellant's motion for new trial was overruled by operation of law. This appeal followed.[3]

## Background

Appellant was an acquaintance of Carla Escobar. Around noon on May 5, 2021, Escobar allegedly sold a pink and silver Taurus brand handgun to Appellant. About two hours after the purchase, Appellant arrived at the home of Escobar's mother, Angelica Perez, in Austin.[4] Appellant, who was wearing a white t-shirt and blue jeans, asked for Escobar.

Upon entering Perez's house, Appellant excused himself to the restroom; he returned and began pacing back and forth. Perez testified she discovered a large amount of blood on the back of Appellant's shirt and asked if he had been stabbed. Perez said Appellant answered affirmatively when she asked if he had been in a fight.

---

guilty of a specified violent offense, the trial court may commit him or her to the Texas Juvenile Justice Department and may later transfer the juvenile to the Institutional Division of the Texas Department of Criminal Justice." (cleaned up)).

[3] This appeal was originally filed in the Third Court of Appeals and was transferred to this Court by a docket-equalization order of the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001. In the event of any conflict, we apply the transferor court's case law. TEX. R. APP. P. 41.3.

[4] According to video recorded from Perez's doorbell, Appellant approached Perez's front door at 1:58 p.m.

Less than ten minutes after Appellant's arrival, Escobar arrived at Perez's home. She noticed a "red car" in the driveway/parking lot of Perez's home. Like Perez, Escobar described Appellant as "filled with blood" on his clothing. Appellant told Escobar the blood was from a fight, but Escobar testified she feared it might be related to the gun she had just sold to Appellant. Escobar provided a different shirt for Appellant to wear.

Escobar was pregnant with a daughter; she was also the parent of an infant daughter. Escobar said Appellant told her she had no choice but to assist him; "if not, my daughters would get hurt." As she left the home, Escobar asked Perez to watch her daughter, saying, "please don't let anybody hurt my baby."

Escobar and Appellant left Perez's home. Appellant was driving a red Hyundai Sonata with heavily tinted windows; the vehicle's description matches one that belonged to R.A.D. Escobar said she initially thought she was going to ride in the red car with Appellant. However, just as she was about to reach the passenger side door, "he yelled at me not to." Appellant instructed Escobar to drive a separate vehicle and to lead the way to her uncle's home in the Killeen area.

In Killeen, Appellant and Escobar learned her uncle was not at home. Later that day, Escobar followed Appellant to a nearby bridge. Appellant instructed Escobar to park her vehicle on the driver's side of the red car; he told her to stay in her vehicle "and not look around." Ignoring his command, Escobar looked into the red Hyundai and saw "a body slumped in the passenger side with a cover thrown on top of it."

Meanwhile, Appellant removed cleaning supplies and trash bags from the trunk of Escobar's vehicle.[5] Appellant also asked if she had any matches or lighter fluid; Escobar denied having any. She testified, "He said he wanted to blow up the car." Escobar said Appellant "went into . . . panic mode," and she observed him wiping down the steering wheel with cleaning wipes. After hearing a "thump," Escobar saw Appellant carrying what she believed to be a body; she observed a bare leg and white shoe dangling from under the blanket as Appellant carried the load to the trunk of the vehicle. Appellant later removed two backpacks from the red car, along with a trash bag containing the gun Escobar had sold him, and placed them in Escobar's vehicle.

According to Escobar, Appellant entered her vehicle, removed a black handgun from a backpack and placed it in his lap with the barrel facing Escobar, and told her to drive him back to Austin. During the return drive, Escobar inquired about what Appellant had done, but he replied it was better that she not know. Appellant eventually told Escobar to drive to her apartment.[6] While they were on the way, Appellant allegedly "gave [Escobar] details about what he did":

- "The boy," i.e., the victim, had set him up, so Appellant devised a plan to get revenge;

- Appellant sent a message to the victim to drive to his home so that Appellant could purchase some marijuana. When the victim arrived, Appellant claimed he needed a ride to a house on 51st Street so that he could obtain funds to pay for the purchase;

---

[5] Escobar's testimony on this subject is inconsistent with other evidence presented at trial. She denied purchasing the items and claimed she denied Appellant's initial request to use them. However, during Appellant's case-in-chief, videos were authenticated that show Escobar entering, shopping, and leaving a Walmart store in nearby Harker Heights on May 5. According to a receipt entered into evidence, Escobar purchased garbage bags, Armor All wipes, a lighter, and bleach at 3:30 p.m. on May 5.

[6] They initially stopped at Perez's home, where Escobar recounted what she had observed.

4

- After the victim drove Appellant to 51st Street and parked, Appellant shot the victim in the neck. Appellant pushed the victim's body into the passenger seat and assumed the driver's seat.

After arriving at Escobar's home, Appellant showered and changed into a pair of shorts. Appellant then gave Escobar directions to drive him to "the house off 51st." After Appellant went inside the home for a brief moment, he returned and told Escobar, "This is where I shot him at."

Escobar testified that later that night she returned to Perez's home and related the story of what had occurred. Escobar and Perez reported to the police station on May 6 and met with Detective Rolando Ramirez. During the multi-hour interview with the detective, Escobar received an audio message she identified as from Appellant's voice; it said, "Cuz, you're scaring the s--t out of me. You better answer or I," before the message terminated. Additional evidence was also obtained by law enforcement around this time:

- Escobar directed police where to locate R.A.D.'s body; Bell County law enforcement found R.A.D.'s body in the trunk of his vehicle.[7]

- Escobar consented to a police search of her vehicle, who recovered two backpacks,[8] blood-stained underwear and blue jeans[9] allegedly belonging to Appellant, and the pink Taurus handgun.[10]

- Police recovered a fingerprint identified as Appellant's from the passenger-side roof of Escobar's vehicle.

---

[7] Autopsy confirmed that R.A.D.'s death was caused by a gunshot wound to the neck, and the manner of death was homicide.

[8] Inside one of the backpacks was a substance believed to be marijuana.

[9] DNA evidence revealed the presence of R.A.D.'s DNA on the blue jeans.

[10] A projectile from R.A.D.'s vehicle was subsequently matched to being fired from the Taurus pistol.

5

Detectives were unable to obtain Appellant's cell phone records. However, the State presented evidence of the historical cell phone data obtained for two of R.A.D.'s mobile phones and Escobar's phone.[11] Per trial testimony, the State showed how mobile phones attempt to choose the cell phone tower with the strongest available signal; data reporting this connection can provide information on the general area in which a phone is located at a particular time. Relevant here, a law enforcement officer testified that one of R.A.D.'s phones "pinged" a cell phone tower near the alleged site of the murder at approximately 1:28 p.m. on May 5.[12] R.A.D.'s phone was later noted as traveling near cell sites in the vicinity of Perez's home, where the phone remained until approximately 2:13 p.m.[13]

Escobar's cell phone was described as initially following a different path until it reached the vicinity of Perez's home. Then, both of R.A.D.'s phones and Escobar's phone reportedly traveled roughly in sync with one another northbound on Interstate 35 from Austin through Georgetown and Jarrell, Texas. Although R.A.D.'s phones ceased connecting with cell phone towers sometime during the afternoon of May 5, Escobar's phone continued to connect; testimony indicated Escobar's phone connected on towers near where R.A.D.'s body was located, then at 8:09 p.m. near the area where the murder was believed to have occurred. Later, Escobar's phone reportedly returned to the area

---

[11] Escobar's phone and one of R.A.D.'s phones operated on the AT&T network and accordingly used similar cell phone service towers.

[12] Detective Ramirez opined the murder site to be at 5301 Tower Trail (in the vicinity of 51st Street and Highway 185). Video recovered from home doorbell cameras depicts a red Hyundai Sonata identical to that of R.A.D.'s passing 5301 Tower Trail at 1:30:54 P.M. on May 5, and then on nearby Bentsen Lane at 1:31:10 P.M.

[13] As indicated above, Perez's doorbell recorded Appellant standing on her front porch at 1:58 p.m.

6

near Perez's home for approximately 30 minutes, before traveling to Escobar's home for the evening.

Appellant unsuccessfully attempted to flee when police attempted to take him into custody. While executing a search warrant at the home of Appellant's mother, police located under a mattress a black semi-automatic Glock pistol containing R.A.D.'s DNA, as well as a pendant belonging to R.A.D. Police learned from Appellant's family that Appellant had stayed in this bedroom a portion of the night following the murder.

## Discussion

### Issues One, Two, and Three: Corroboration of Testimony of Accomplice Witness Carla Escobar

Through three issues that we discuss jointly, Appellant challenges the sufficiency of Escobar's accomplice testimony. The jury was instructed that Escobar was an accomplice as a matter of law. The Texas Family Code, which covers the proceedings in all cases involving delinquent conduct, provides as follows:

> An adjudication of delinquent conduct or conduct indicating a need for supervision cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the child with the alleged delinquent conduct or conduct indicating a need for supervision; and the corroboration is not sufficient if it merely shows the commission of the alleged conduct.

TEX. FAM. CODE ANN. § 54.03(e). We construe section 54.03 similarly to article 38.14 of the Texas Code of Criminal Procedure. *See In re D.M.T.,* No. 11-21-00121-CV, 2022 Tex. App. LEXIS 7109, at *15–16 (Tex. App.—Eastland Sept. 22, 2022, pet. denied) (mem. op.) (giving parallel construction). When examining the record for corroborating evidence, a reviewing court disregards the accomplice's testimony and examines the

7

remaining record to determine if any evidence tends to connect the accused with the commission of the crime. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007); *In re J. A. M.,* No. 03-02-00610-CV, 2003 Tex. App. LEXIS 8662, at *6–7 (Tex. App.—Austin Oct. 9, 2003, no pet.) (mem. op.). Such evidence does not have to directly link the accused to the crime, nor does it alone have to establish guilt beyond a reasonable doubt; it must merely tend to connect the accused to the offense. *McDuff v. State,* 939 S.W.2d 607, 613 (Tex. Crim. App. 1997). "The tends-to-connect standard does not present a high threshold, and we view the connecting evidence in the light most favorable to the verdict and judge each case on its own facts." *Fabian v. State,* No. 03-19-00486-CR, 2021 Tex. App. LEXIS 6084, at *37 (Tex. App.—Austin July 29, 2021, no pet.) (mem. op., not designated for publication) (cleaned up).

1. <u>Corroborating Evidence: Murder</u>

The jury was charged, "a person commits the offense of Murder if he intentionally or knowingly causes the death of an individual." Surveillance video shows a car identical to R.A.D.'s, passing the suspected murder location at 1:30 p.m. on May 5. Then approximately 30 minutes later, video reveals Appellant arriving in a vehicle matching R.A.D.'s at Perez's home. As Perez observed from this visit, Appellant's shirt and blue jeans were stained with so much blood that she believed he had been stabbed. Appellant confirmed he had been in a fight. R.A.D.'s DNA was identified on Appellant's blue jeans. While in the home, Appellant paced back and forth while waiting for Escobar. When he left Perez's home, Appellant wore a different shirt than the one he wore on arrival.

Cell phone data associated with R.A.D.'s phones indicate being located near the suspected murder site at the same approximate time the video captures the red car at the same location. Then, one of the victim's phones pings along a cell site path near Perez's home during approximately the same time Appellant is shown to be at Perez's home. The evidence shows that the phone then traveled in the same general direction as Escobar's phone: away from Perez's home and north bound on Interstate 35. Escobar's phone continued to ping from cell tower sites, where it was found to be within the general vicinity of where R.A.D.'s body was recovered. Evidence from about 3:30 p.m. on May 5 shows Escobar entering, shopping, and leaving a Walmart in Harker Heights. A receipt revealed she purchased bleach, wipes, garbage bags, and a lighter.

On May 6, while Escobar and Perez spoke with police, Appellant sent a voice message to Escobar, saying, "Cuz, you're scaring the s--t out of me. You better answer or I." A search by police of Escobar's vehicle produced a pink Taurus handgun, Appellant's two backpacks, one containing blood-stained underwear and blue jeans, and a substance believed to be marijuana. Police located Appellant's fingerprint on the exterior passenger roof of Escobar's car. In addition, Bell County law enforcement located R.A.D.'s car, where they found the decedent's body in the trunk, which also contained empty bleach bottles and smelled of bleach. The passenger compartment contained blood and a bullet projectile eventually linked to the pink Taurus pistol.

Beneath the mattress of the bed in a room where Appellant stayed on the night following the murder, police located a black Glock pistol and R.A.D.'s pendant. The barrel of the handgun and pendant contained R.A.D.'s DNA. When police attempted to take

9

Appellant into custody, he fled. This evidence independent of Escobar's testimony tended to connect Appellant with the offense of R.A.D.'s murder.

### 2. Corroborating Evidence: Tampering With Physical Evidence

As charged by the court, "[A] person commits the offense of Tampering with Physical Evidence if, knowing that an offense has been committed, alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation of or official proceeding related to the offense." The corroborating evidence shows the following: At Perez's home on the day of the murder, Appellant exchanged the blood-stained shirt for a different shirt. Moreover, as noted above, police officers recovered a handgun and pendant containing R.A.D.'s DNA, concealed beneath the mattress of the bed in which Appellant slept for a portion of the night following the murder. We conclude this evidence tended to connect Appellant with the offense of tampering with physical evidence.

### 3. Corroborating Evidence: Abuse of a Corpse

Per the court's charge, "[A] person commits the offense of Abuse of Corpse if the person, without legal authority, knowingly disinters, disturbs, damages, dissects, in whole or in part, carries away, or treats in an offensive manner a human corpse." The corroborating evidence shows the following: When Appellant appeared at Perez's home on the day of the murder, he was driving a vehicle identical to one that belonged to R.A.D. (within which R.A.D.'s body was discovered in the trunk the day after the murder).[14] Perez reports that when Appellant arrived at her home his clothing was stained with blood.

_____

[14] Evidence indicated the vehicle's trunk also contained empty bottles of bleach.

10

Given this evidence, as well as the cell phone data tracking the path of where R.A.D.'s phone moved from the alleged murder scene to Perez's home to a route in the direction of where R.A.D.'s body was found, the jury could reasonably infer that R.A.D. was dead and that Appellant was carrying the corpse away in R.A.D.'s vehicle. This evidence tended to connect Appellant with the offense of abuse of corpse.

Appellant's first, second, and third issues are overruled.

**Issue Four: Limiting Offer of Proof**

By his fourth issue, Appellant complains that the trial court prevented him from preserving error by denying him a full opportunity to examine Escobar outside the jury's presence on matters intended to impeach her character as a witness. Appellant's presentation centered on claims that Escobar had cooperated with the district attorney's office and the Innocence Project in seeking a new trial for her father,[15] as well as her immunity for matters related to R.A.D.'s death. Before commencing a question-and-answer offer of proof, Appellant's counsel stated:

> We believe that all of that information is admissible because it's, one, probative; two, it goes to impeachment, because my entire testimony is going to be that she was testifying even before she was given this grant of immunity. She has never been charged, and she continues to work with the District Attorney's Office. And her whole basis for being here and making these implications against the Respondent is because that she is avoiding any prosecution for anything that she's done; and, two, that her relationship with her father's appeal is also biased because that goes to motive, intent of, one, why she was never charged--arrested, charged; and, two, why she is being able to testify here today.

---

[15] Her father had been convicted of capital murder for another offense.

11

During the question-and-answer presentation that followed, two objections by the State were sustained by the trial court.

A party may claim error in a ruling admitting or excluding evidence only if the error affects a substantial right of the party and, if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context. TEX. R. EVID. 103(a)(2). However, when a cross-examiner intends, as here, to call into question a witness's character for truthfulness, that burden is relaxed. *Holmes v. State,* 323 S.W.3d 163, 170 (Tex. Crim. App. 2009). Appellant's presentation at the hearing outside the jury's presence acquainted the trial court with his desire to impeach Escobar's character for truthfulness with evidence of her involvement with the district attorney's office, the Innocence Project, her father's capital-murder case, and her receipt of immunity. These matters would tend to impeach Escobar as a witness by showing her bias and motivation for her testimony. We conclude Appellant's presentation made counsel's intentions clear; thus, the trial court's rulings on objections did not prevent Appellant from preserving error or limit Appellant's offer of proof.

Appellant's fourth issue is overruled.

**Issue Five: Limitation of Cross-examination**

In related manner, Appellant's fifth contention is that the trial court reversibly erred by denying Appellant the opportunity to cross-examine Escobar on her cooperation with the district attorney's office and the Innocence Project in their effort to have her father's conviction for capital murder overturned. During the hearing outside the jury's presence, Escobar testified she did not know who was assisting her father with his effort to obtain a

12

new trial and that she had not spoken with an attorney from the district attorney's office or any other organization about her father's case.

A proponent of evidence purporting to show bias of a witness must demonstrate that such evidence is relevant. *Woods v. State*, 152 S.W.3d 105, 111 (Tex. Crim. App. 2004). This is accomplished by "demonstrating that a nexus, or logical connection, exists between the witness's testimony and the witness's potential motive to testify in favor of the other party." *Id.* In other words, the record must demonstrate the witness "had the expectation that [s]he would be rewarded for testimony favorable to the State or punished for testimony that was unfavorable to the State." *Id.* at 112; *see also Nash v. State,* No. 03-12-00456-CR, 2013 Tex. App. LEXIS 10480, at *10–12 (Tex. App.—Austin Aug. 21, 2013, pet. ref'd) (mem. op., not designated for publication) (following *Woods*). Like the trial court, we fail to see any nexus between Escobar's testimony at Appellant's trial and her father's effort at obtaining a new trial.

Moreover, even assuming the trial court erred by limiting the scope of Appellant's cross-examination, such error would have been harmless. TEX. R. APP. P. 44.2(a); *see In re J.H.,* 150 S.W.3d 477, 485 (Tex. App.—Austin 2004, pet. denied) ("because of the quasi-criminal nature of juvenile proceedings and the possibility with a determinate sentence of imprisonment that extends into adulthood . . . the criminal-harm analysis should govern in juvenile appeals concerning the imposition of a determinate sentence."). The jury had ample opportunity to question Escobar's credibility. First, she was an accomplice as a matter of law. Second, her denials of having any involvement were undermined by independent footage and a receipt proving she indeed bought cleaning

13

supplies at Walmart.[16]  Third, Escobar testified subject to her own immunity agreement with the State.  We fail to see how evidence of her father's possible efforts would have affected the jury's assessment of Escobar's credibility beyond what this evidence already demonstrates.

Appellant's fifth issue is overruled.

## Conclusion

Having overruled each of Appellant's issues on appeal, we affirm the judgment of the trial court.


Lawrence M. Doss
Justice

---

[16] During Appellant's cross-examination of Escobar, the following exchange took place:

Q. Isn't it true that those cleaning products which you say you had in your car, you actually went and purchased them at that Walmart store?
A. No.
Q. *Are you as sure about that as you are the rest of your testimony?*
A. *Yes.*
(emphasis supplied).