

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-15-00413-CR

JOSEPH MIJIMU KAMANGA                                              APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

----------

### FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1380917D

----------

## OPINION

----------

A grand jury indicted Appellant Joseph Mijimu Kamanga for continuous sexual abuse of a child,[1] charging that

> through the 1st day of July, 2014, [he] did intentionally or knowingly, during a period of time that is 30 days or more in duration, commit two or more acts of sexual abuse, to wit: aggravated sexual assault of a child under 14 years of age by causing the sexual organ of the defendant to contact the sexual organ of [J.K].

---

[1]See Tex. Penal Code Ann. § 21.02(b), (c)(4), (h) (West Supp. 2016).

A jury convicted Appellant of the offense, and the trial court sentenced him to twenty-five years' confinement.[2]  In one issue, Appellant contends that the trial court abused its discretion by excluding impeachment evidence regarding a verbal threat the complainant J.K. had allegedly made to Appellant before her outcry.  Because we hold that the trial court's error was harmless, we overrule Appellant's sole issue and affirm the trial court's judgment.

**Facts**

Jennifer Meadows testified that she served as a volunteer parent counselor at a church camp in the summer of 2014.  J.K. was one of the thirteen sixth-grade girls staying in the cabin supervised by Meadows.  On the second or third night of camp, Meadows noticed that J.K. was "really, really weepy" and "really sad."  When they spoke after the service, J.K. told Meadows "that her uncle had hurt her and that he had videotaped it so that you could tell it was her, but he had told her that—you couldn't tell it was him, and if she ever told anybody, he would show her parents the videotape."  Meadows concluded that J.K. was alluding to sexual abuse.  J.K. told Meadows that the acts and videotaping occurred at the home of her uncle, Appellant, and last occurred two months earlier.  J.K.'s physical demeanor indicated shame, according to Meadows, because J.K. "kept dropping her face and not wanting to look at" Meadows.  Meadows stated that J.K. was ashamed, embarrassed, and scared.

---

[2] *See id.*

2

Meadows stopped J.K. from going into any detail and reported the conversation to the church's children's director. Meadows also filled out a report that the "security guy at church" provided to CPS.

On the day she left church camp, J.K. gave more detailed information to her parents and pastor and then to her extended family at a family meeting (a meeting which included her parents, pastor, Appellant, aunts, and other uncles). Over the next few days, J.K. spoke with a sexual assault nurse examiner, a CPS investigator, and a forensic interviewer. About nine or ten months after her initial outcry, J.K. met with an investigator appointed for the defense (defense investigator). J.K., her father, other relatives, her pastor, the CPS investigator, the sexual assault nurse examiner, and the forensic interviewer also testified. The trial court admitted recordings of J.K.'s interviews with the CPS investigator, the forensic interviewer, and the defense investigator.

In her testimony at trial, J.K. confirmed that she had told Meadows that Appellant had raped her. J.K. testified that it first happened when she was eight years old and was spending the night at Appellant's apartment with her cousin, his daughter A.K. According to J.K., Appellant entered the bedroom in which she was sleeping and woke her by removing her pajama pants; he also removed her underwear and pulled his own shorts and underwear down. She testified that he lay on top of her, told her not to scream, covered her mouth with his hands "so hard," "put his dick into [her] vagina," and "started moving up and down." J.K. testified that it lasted "[a]bout 15 minutes." After Appellant finished, he re-

3

dressed himself and J.K. and left. J.K. testified that she did not tell anyone because she was so scared.

J.K. testified that penile-vaginal penetration happened twice more when she was nine years old and that it last happened the night before she left for church camp; she was twelve years old then. J.K. also described an incident of digital penetration that she said occurred when she was ten.

On cross-examination, J.K. denied telling Meadows and her parents that the last incident had occurred two months before church camp but admitted telling her extended family at the family meeting, the forensic interviewer, and the CPS investigator that it had occurred two months before camp and testified that that was a lie. J.K. also admitting telling Meadows, the CPS investigator, and the forensic interviewer that the sexual abuse had always happened at Appellant's home but testified that it had also happened at her home and that she had told her parents that as well. She answered, "I don't know," when asked whether she had lied to the CPS investigator. She later admitted that she had lied to both the CPS investigator and the forensic interviewer.

J.K. also admitted telling Meadows, her parents, and her pastor about another child that Appellant had sexually abused, D.D., but lying to the CPS investigator that she knew of no other complainants. J.K. testified that she told the forensic interviewer that she saw Appellant drag the other girl into another room but told the defense investigator that she was not present for that incident and only heard about it. J.K. admitted that she had lied to the defense

4

investigator about that and about the last act of sexual abuse occurring at her house. On redirect examination, though, J.K. said that she had been confused about what the defense investigator was asking.

J.K. also admitted that she had told the CPS investigator that Appellant had touched her with his hands and that she had not mentioned "penis" or "vagina" in that conversation. She further admitted that she had not discussed digital penetration with the forensic interviewer.

J.K. testified that she had lied because her aunt had told her to "just lie and say that those things never happened." J.K. further admitted telling the defense investigator that she does not always tell the truth and was not sure that she was going to tell the defense investigator the truth.

The forensic interviewer testified that a "rolling outcry," where children say less initially than they eventually say, is common for abused children.

Appellant's wife and daughter denied that J.K. had spent the night with them any place other than Haltom City. Both testified that they were light sleepers. Appellant's wife testified that he did not leave their bed when J.K. spent the night. His daughter testified that she was never awakened by any screaming or struggling. Appellant's wife and daughter agreed that Appellant had entered the bedroom when J.K. was spending the night before the girls left for camp. But both explained that he had gone into the bedroom to pray for the girls' safe journey and that his wife had gone into the bedroom with him and the four had prayed together.

5

There was no physical evidence of the sexual assaults.

The defensive theory of the case was that J.K. was lying about Appellant sexually abusing her. The defense focused on the differing accounts she gave of where the abuse occurred, when it occurred, and the acts it entailed. But the defense also wanted to show the jury a motive for J.K.'s fabrication. On cross-examination, J.K. denied having a bad attitude at church generally and denied having a bad attitude at church a couple of weeks before church camp. The following then transpired,

> Q. [Defense Counsel] . . . [D]o you recall an incident where a[n] usher named John told you to come inside the church and you refused?
>
> A. No.
>
> Q. No? You were with your friend [D.D.]?
>
> A. She don't even go to my church.
>
> Q. She went with you to your church sometimes, though, right, as your guest?
>
> A. Yes.
>
> Q. You don't remember any incident where the usher told you to come inside and you refused?
>
> A. No.
>
> Q. And [Appellant] came out and you threatened him?
>
> A. I didn't.
>
> Q. You didn't. You don't remember or it didn't happen?
>
> A. I don't remember.

6

Q. Have you ever told [Appellant], you keep following me around and getting in my business, one day you're going to see?

A. No.

Q. No. You didn't tell your friend [D.D.] he's going to do what I want someday?

A. No.

Kalanga Kashanda, who goes by John, testified that he was a deacon at the church and that he knew both Appellant and J.K. The following dialogue occurred during John's testimony,

Q. [Defense Counsel]. Okay. Now, was there a time you came into contact with [J.K.] at the Pantego Bible Church in June of 2014, last year?

A. I don't remember exactly the day, but I'm sure it's last year.

Q. Okay. And what happened when you came into contact with her?

A. My service like a deacon I supposed to bring in kids from outside to go to church.

Q. So you bring in the kids from outside to come back in the church?

A. Yes, sir. I went there, I find that there was, like, three or four or five. I told them to go back in church, and she— the one she said something like—

[Prosecutor]:          Objection, hearsay.

THE COURT:          Sustained.

[Defense Counsel]:          Your Honor, may we approach?

THE COURT:          Okay.

(At the Bench, on the record)

7

| | |
|---|---|
| [Defense Counsel]: | . . . I asked [J.K.] yesterday if she threatened him. He's a witness—she said no, so this is impeachment. He's going to testify as to the threat. |
| THE COURT: | Response? |
| [Other Prosecutor]: | He asked her if she threatened him, not— |
| [Defense Counsel]: | I'm sorry. I asked [J.K.] on the stand if she threatened [Appellant]. She said she did not. Mr. Kalanga is a witness to that threat. |
| THE COURT: | The hearsay objection is sustained. |

(Bench conference concluded)

Q.  (BY [Defense Counsel]) John?

A.  Yes, sir.

Q.  Were you present at the Pantego Bible Church last year, last summer when [J.K.] threatened [Appellant]?

| | |
|---|---|
| [Prosecutor]: | Objection, hearsay. |
| THE COURT: | Sustained. |
| [Defense Counsel]: | It didn't call— |
| THE COURT: | The objection is sustained. |
| [Defense Counsel]: | No further questions, Your Honor. |

## Law and Analysis

To preserve error regarding excluded evidence, the substance of the excluded evidence must be shown by an offer of proof unless it is apparent from

8

the context of the questions asked.[3]  Error may be preserved by an offer of proof in question and answer form or in the form of a concise statement by counsel.[4] Counsel's concise statement must include a summary of the evidence offered.[5] Error is not preserved if the offer of proof is inadequate.[6]

While the issue of preservation is close, defense counsel did provide a bare-bones summary of the testimony he expected to elicit from John.  Defense counsel stated, having questioned John about a day at church before the outcry, "I asked [J.K.] yesterday if she threatened him.  He's a witness—she said no, so this is impeachment.  He's going to testify as to the threat," and defense counsel clarified, "I asked [J.K.] on the stand if she threatened [Appellant].  She said she did not.  Mr. Kalanga [John] is a witness to that threat."  This statement as clarified is a sufficient offer of proof regarding the excluded testimony to preserve Appellant's appellate challenge to the trial court's ruling.

The Texas Court of Criminal Appeals held in May of this year,

> The Texas Rules of Evidence permit the defendant to cross-examine a witness for his purported bias, interest, and motive without undue limitation or arbitrary prohibition.  Rule 404(b) permits

---

[3]Tex. R. App. P. 33.2; Tex. R. Evid. 103(a)(2); *Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009).

[4]Tex. R. Evid. 103(b); *Holmes*, 323 S.W.3d at 168.

[5]*Holmes*, 323 S.W.3d at 168.

[6]*Id.* at 171; *see also Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009) (holding that error was not preserved when appellant failed to proffer, with some degree of specificity, the substantive evidence he intended to present).

the defense, as well as the prosecution, to offer evidence of other acts of misconduct to establish a person's motive for performing some act—such as making a false allegation against the defendant. Rule 613(b) permits a witness to be cross-examined on specific instances of conduct when they may establish his specific bias, self-interest, or motive for testifying. Rule 412 specifically addresses the admissibility of evidence of a victim's past sexual behavior. Such evidence is admissible if it "relates to the motive or bias of the alleged victim" or "is constitutionally required to be admitted," and if "the probative value of the evidence outweighs the danger of unfair prejudice."

. . . .

. . . [E]vidence was admissible under Rule 412 because it related to H.H.'s motive to fabricate the accusation, was constitutionally required to be admitted under the Confrontation Clause, and the probative value outweighed the danger of unfair prejudice.[7]

Unfortunately, neither the trial court nor trial or appellate counsel had the benefit of the Texas Court of Criminal Appeals's *Johnson* opinion. The evidence of any threat by the complainant that is evidence of bias or motive to fabricate is admissible, and the error in excluding such evidence can be of constitutional magnitude, depending on the defendant's complaint.[8] *Johnson* also stands for the broader proposition that a defendant is allowed to put on his defense, even when his defense is that the complainant is lying.[9] Here, Appellant offered the evidence of J.K.'s threat for impeachment of her testimony denying her threats.

---

[7]*Johnson v. State*, 490 S.W.3d 895, 910, 913 (Tex. Crim. App. 2016) (footnotes omitted).

[8]*See id.*

[9]*See id.*

10

The evidence was not hearsay.  Hearsay

is an out-of-court statement "offered in evidence to prove the truth of the matter asserted."  Whether hearsay is admissible at a criminal trial is determined by the Texas Rules of Evidence and the Sixth Amendment of the U.S. Constitution.  Although the rules of confrontation and the rules of hearsay generally protect similar values, the overlap between the two is not complete.[10]

Appellant sought to elicit a recitation of the words J.K. had spoken when John told the youngsters to come inside to show that the words were spoken, not to show that the content of the statement was true.  An extrajudicial statement which is offered for the purpose of showing what was said rather than for the truth of the matter stated does not constitute hearsay.[11]  We therefore hold that the trial court abused its discretion by sustaining the hearsay objection because (1) Appellant was not offering John's recitation of J.K.'s threats, if any, to Appellant for their truth but to show that they were made and (2) Appellant was allowed to impeach her.

But Appellant did not mention or allude to either the federal or state constitution.  He only raised an evidentiary complaint, so we apply rule 44.2(b) of the appellate rules of procedure in assessing harm.[12]  We therefore disregard the

---

[10]*Bays v. State*, 396 S.W.3d 580, 593–94 (Tex. Crim. App. 2013) (citations omitted); *see also* Tex. R. Evid. 801(d).

[11]*Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App.), *cert. denied*, 516 U.S. 832 (1995).

[12]*See* Tex. R. App. P. 44.2(b).

error if it does not affect substantial rights.[13]  A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.[14]  Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect."[15]

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case.[16]  We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable.[17]

The only evidence before us about Appellant's claims regarding the threat is that J.K. may have resented his interference with her desire to make her own decisions about how she lived her life.  And although defense counsel alluded to

---

[13]*Id.*

[14]*King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).

[15]*Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (citation and internal quotation marks omitted); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

[16]*Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

[17]*Id.* at 355–56.

12

an overheard threat while questioning John, defense counsel did not explain at that point the substance of the threat that he expected John to testify to having overheard. Defense counsel did suggest while cross-examining J.K. that she had said, "you keep following me around and getting in my business, one day you're going to see," and "[H]e's going to do what I want someday." The jury heard J.K. deny that she had said these things, and they also heard Appellant's trial counsel ask John, "Were you present at the Pantego Bible Church last year, last summer when [J.K.] threatened [Appellant]?" Before John could answer, the State lodged its hearsay objection, and the trial court sustained the objection. But even before that exchange, John had attempted to volunteer a statement, regarding bringing kids back into the church from outside, that "she—the one she said something like—." Finally, at a bench conference defense counsel requested in response to the trial court's ruling, he made the following informal offer of proof:

> I asked [J.K.] yesterday if she threatened him. He's a witness—she said no, so this is impeachment. He's going to testify as to the threat.
>
> . . . .
>
> I asked [J.K.] on the stand if she threatened [Appellant]. She said she did not. Mr. Kalanga [John] is a witness to that threat.

There is no further offer of proof and no argument that the trial court's erroneous ruling constituted a violation of a constitutional right.

13

The case was a classic swearing match. The complainant testified to the sexual assaults. Appellant and his wife and daughter denied that any sexual abuse occurred. There was no physical evidence of the sexual assaults. The jury heard the challenges to the veracity of J.K.'s testimony. The jury was aware that there was no physical evidence of sexual abuse. The jury heard Appellant's suggestions that J.K. had made threats to punish him for interfering with her freely enjoying her life as she chose. But the jury did not hear John confirm that he had heard J.K. express a threat. And unlike the *Johnson* jury, there was no evidence that this jury heard misrepresentations that the defendant was prevented from challenging and that were likely to mislead the jury.[18]

We conclude that, in the context of the entire case against Appellant, the trial court's error in excluding any evidence of a threat by J.K. did not have a substantial or injurious effect on the jury's verdict and did not affect Appellant's substantial rights.[19] Thus, we disregard the error.[20] We overrule Appellant's issue.

**Conclusion**

Having overruled Appellant's sole issue, we affirm the trial court's judgment.

---

[18] *See Johnson*, 490 S.W.3d at 914.

[19] *See King*, 953 S.W.2d at 271.

[20] *See* Tex. R. App. P. 44.2(b).

                                        /s/ Lee Ann Dauphinot
                                        LEE ANN DAUPHINOT
                                        JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

PUBLISH

DELIVERED:  September 29, 2016