

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-24-00559-CR

Noel **VILLARREAL**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2023CR2108
Honorable Catherine Torres-Stahl, Judge Presiding

Opinion by:    Adrian A. Spears II, Justice

Sitting:       Irene Rios, Justice
               Lori Massey Brissette, Justice
               Adrian A. Spears II, Justice

Delivered and Filed: October 22, 2025

AFFIRMED

After a jury trial, Noel Villarreal was found guilty of murder and being a felon in possession of a firearm. He was sentenced to sixty years of imprisonment with respect to his murder conviction and twenty years of imprisonment with respect to his conviction for being a felon in possession of a firearm (enhanced second degree). On appeal, he brings three issues. First, he argues the trial court erred in not permitting statements of the deceased complainant to be admitted because those statements fell under the "state of mind" exception to the hearsay rule. Second, he

argues that the trial court erred in not permitting the compulsory process of witness Jesse Munoz. Third, he argues he received ineffective assistance of counsel. Because we hold the trial court did not err in its evidentiary rulings and because we hold Villarreal has not shown he received ineffective assistance of counsel, we affirm.

## BACKGROUND

On December 22, 2022, Ruben Martinez was shot eleven times and killed in the parking lot of the Oyo Hotel. Surveillance video from the Oyo Hotel and nearby businesses was introduced in evidence. The shooting was caught on the periphery of one of the surveillance videos; the top right corner of the surveillance video shows two men circling a vehicle while one man fires gunshots at the other. After the shooting, a man is seen getting on top of a vehicle's roof and then jumping over the fence to the street where he is picked up by an SUV.

At trial, Miguel Martinez testified that on December 22, 2022, at approximately noon, he was working in the shop of the nearby Three Brothers Diesel when he heard several gunshots coming from the Oyo Hotel. He saw a man shooting at another person, and when the man finished shooting, he jumped the fence at the hotel and got into an SUV that was waiting for him. Miguel Martinez testified that he saw a woman driving the SUV, and the shooter was in the passenger seat.

Detective Leroy Carrion identified the shooting victim as Ruben Martinez. From surveillance video, Detective Carrion determined the "shooter fled the rear of the motel, jumped over an aluminum-style high fence and fled south behind the location." He testified that on the surveillance video, he saw a gold SUV "approach that street, on the street directly under the fence and . . . the shooter jump[ed] in—or g[ot] into that SUV." Detective Carrion testified that the green SUV, which had been driven by Ruben Martinez and parked in the hotel parking lot, was moved

after the shooting. Detective Carrion also testified that the surveillance video showed a young male move the green SUV after the shooting. Detective Carrion testified that the young male was later identified as Jesse Munoz. According to Detective Carrion, he later determined that the green SUV had not belonged to Ruben Martinez but belonged to someone else.

The owner of the gold SUV who picked up the shooter on the back street was identified as Whispeny Dodd. Dodd came back later to the scene in a different vehicle. She told Detective Carrion that she was the person who drove the SUV away from the scene and that the person with her in the vehicle was Villarreal. Detective Carrion obtained an arrest warrant for Villarreal and interviewed him.

Whispeny Dodd testified that on December 22, 2022, she was staying at the Oyo Hotel and had known Villarreal for a few weeks from interactions she had with him at the hotel. She testified she had been staying at the hotel for a couple of months. According to Dodd, on December 22, 2022, she and Villarreal were planning to wash clothes. However, Villarreal arrived at her room without clothes. Dodd testified that she and Villarreal smoked methamphetamine. They then drove around to the side of the hotel in her gold SUV and parked. She and Villarreal carried clothes to the SUV. While she and Villarreal were sitting in her vehicle, Ruben Martinez drove into the hotel parking lot, stopped to talk to another woman walking, and then drove further into the hotel parking lot. Dodd testified she then drove to a different side of the hotel, stating that she parked at a different spot to pick up clothes from others at the hotel. She testified that Villarreal got out of her vehicle and said, "I got to do what I got to do." Dodd testified, "I didn't think it was go [sic] murder [Ruben Martinez], but I knew he was going to hurt him, scare him, or rob him or something." According to Dodd, she did not know Villarreal had a gun until he pulled one out of his backpack before getting out of her vehicle.

Dodd testified that she then left the hotel in her vehicle. She drove to the street behind the hotel and saw Villarreal jump over the fence. Villarreal got inside her SUV. According to Dodd, when Villarreal got inside her SUV, he said something like "I got him" or "I shot him." She then dropped Villarreal off at another motel, which was located near Interstate 35. When asked why she had driven to the street behind the Oyo Hotel and picked up Villarreal, Dodd testified, "I thought I would help because—because—I don't know, I thought Noel [Villarreal] was a good person and Bamm [Ruben Martinez] was scaring a lot of people, waving guns and shit around, and I didn't think it was right what [Ruben Martinez] did." The prosecutor asked Dodd what she was referring to, and Dodd replied that Ruben Martinez had stolen Villarreal's "money and his vehicle and everything else." The prosecutor asked Dodd to describe Villarreal's demeanor when he got into her car after the shooting. Dodd replied that Villarreal was calm. After dropping off Villarreal at his hotel, Dodd switched her vehicle with another vehicle, explaining that she was scared someone from the hotel might follow her. She eventually went back to the Oyo Hotel because her thirteen-year-old daughter was there.

Dodd testified that while she was living at the Oyo Hotel, she was scared of Ruben Martinez "[b]ecause he was always going around waving guns and then he had a gun and faced it towards where my daughter was in the hotel room." She testified Ruben Martinez was known as a "jack boy," or someone who "[g]oes around jacking everybody." Dodd explained that "jacking" was another word for stealing and robbing. The defense asked Dodd if she knew Ruben Martinez's reputation for being a law-abiding citizen. She replied, "As far—as far as following the law, I mean, we were all doing illegal things." Dodd testified that she had seen Ruben Martinez carrying guns and was afraid of him.

Dodd testified that Ruben Martinez and a woman named "Gemini" were in a relationship. Gemini "was one of the main people in the hotel" and knew Villarreal. According to Dodd, Gemini "set up" Villarreal so that Ruben Martinez could rob him. Dodd clarified that she was not present when Villarreal was robbed and learned about the incident from two other people who woke her up in the middle of the night at the hotel. Dodd explained that a week before Ruben Martinez was shot, she was awoken by Villarreal and another person. They told her that Ruben Martinez had "hurt Gemini or—and robbed Noel [Villarreal] or whatever." Because Dodd had cameras facing the outside, they wanted to know if they could see the video footage. Dodd explained she did not have an SD card in the camera, so no footage had been recorded. She then shut the door and went back to sleep.

Dodd testified that as far as she knew, Villarreal and Gemini were just friends. Dodd met Villarreal because he had been visiting Gemini in Gemini's room. Dodd testified that Gemini had access to illegal drugs and that Villarreal used illegal drugs.

When asked about Jesse Munoz, Dodd testified that he was another person at the hotel who was around Ruben Martinez. Dodd testified that she later found out that the green SUV driven by Ruben Martinez on the day of the shooting was stolen. This green SUV was not Villarreal's stolen vehicle but was a different stolen SUV. Dodd was asked whether Ruben Martinez had been planning to sell Villarreal's stolen vehicle back to him. Dodd explained that Ruben Martinez had been planning to sell Villarreal's vehicle but not to Villarreal. Dodd testified that she was going to pay for Villarreal's vehicle so that Villarreal could get his vehicle back.

Dodd was then asked whether Villarreal went back to the hotel after his SUV was stolen by Ruben Martinez. She testified that he did return to the hotel and to Gemini's room where he had been robbed. When asked what Villarreal did back in Gemini's room, Dodd replied that they

all used illegal drugs and got "high." She described Villarreal's demeanor on returning to the room where he had been robbed as "[u]pset but calm." She testified Villarreal did not seem nervous. Dodd was then asked whether Ruben Martinez smoked "meth." She replied, "Everybody did."

Noel Villarreal testified in his own defense. He admitted to having an extensive criminal history and being a meth user. According to Villarreal, the last day he used meth was the day of his arrest. He met Whispeny Dodd because his girlfriend knew another woman named Gemini. He had known Gemini for about a year and believed she was his friend. According to Villarreal, when he went to visit Gemini in her hotel room on the day he was robbed by Ruben Martinez, Gemini had been living at the Oyo Hotel for four months. At some point between noon and 1 p.m., he left Gemini's room and went to his vehicle. He first met Ruben Martinez in the stairwell. Ruben Martinez was on the second floor, looking down at Villarreal on the first floor. Villarreal testified he looked up and Ruben Martinez was saying something to him. Villarreal replied, "I don't understand what you're saying." Ruben Martinez said something again, and Villarreal replied, "Why don't you come down here." According to Villarreal, Ruben Martinez then said, "I'll speak with you." Ruben Martinez demanded to know if Gemini was Villarreal's girlfriend. Villarreal responded, "No, that's not my girlfriend. I got a girlfriend. I just know her. She's a friend of mine." Villarreal testified he was "sizing up" Ruben Martinez and trying to figure out why Ruben Martinez asked him about Gemini—whether Ruben Martinez and Gemini were together. Ruben Martinez asked Villarreal what he did for a living. Villarreal testified the conversation led to his vehicle and that after the conversation, Villarreal went back to Gemini's room, retrieved his car keys, and went to his mother's home.

Later that night, Gemini invited Villarreal back to her hotel room. When he arrived, Gemini, Whispeny Dodd, and another woman were in the hotel room. Villarreal testified they were

all "smoking." Around midnight, the three women left the room. Villarreal testified that Gemini then came back into the room, and she and Villarreal had a conversation. Someone knocked at the door, and Gemini answered the door. Ruben Martinez entered and began talking to Gemini. Villarreal testified that Ruben Martinez took Gemini's purse, dumped the contents on the bed, and then took money from the purse. Ruben Martinez and Gemini had "another conversation" and then Ruben Martinez "withdr[ew] a firearm and he start[ed] pointing it." According to Villarreal, as Ruben Martinez pointed the gun at him, there was another knock at the door, and Ruben Martinez answered it. Ruben Martinez opened the door and asked Gemini if he could let his two friends inside. Gemini replied, "Yes." Two men entered. Villarreal testified that one of the men was Jesse Munoz. Villarreal testified the three men had a conversation with Gemini. At some point, Gemini and the three men faced Villarreal. Villarreal testified that Ruben Martinez was still pointing a gun at him, and one of the other men had his hand in his pocket, which Villarreal assumed was another gun. Villarreal testified that Ruben Martinez approached him, put his hand in Villarreal's pocket, and took Villarreal's money and car keys. The men then left and Gemini closed the door. Villarreal called someone to pick him up from the hotel.

According to Villarreal, almost three weeks later, he came back to the Oyo Hotel because Ruben Martinez told Gemini he wanted to "sell back" the vehicle to Villarreal. Villarreal testified that on the day of the shooting, he had been invited to the hotel by Whispeny Dodd. He testified he was thinking only about getting his "truck back" and had brought a gun with him because he knew Ruben Martinez had one. Villarreal testified he did not report his vehicle as stolen to the police because he had an outstanding warrant for cutting his ankle monitor. As he approached Ruben Martinez, Villarreal had his gun in the "front waist" of his pants. According to Villarreal, he did not pull his gun out of his waistband until he saw Ruben Martinez go "for his waist," which

Villarreal believed was Ruben Martinez reaching for his own gun. Villarreal testified, "When [Ruben Martinez] reached for his firearm, I reached for the firearm I had, and I defended myself."

On cross-examination, Villarreal admitted that he had been imprisoned before for offenses involving guns. He had been convicted of aggravated robbery and had gone to prison for burglary of a habitation. He admitted that he had "most recently" been on parole for possession of illegal drugs. When asked how long he had been a fugitive at the time of the shooting, Villarreal replied "four or five" months. Villarreal was further asked how many times he had returned to the Oyo Hotel between the time he had been robbed and the shooting, Villarreal replied four times.

When asked to clarify his first meeting with Ruben Martinez in the stairwell, Villarreal testified that Ruben Martinez described himself as a "jack boy." According to Villarreal, Ruben Martinez asked him what he did for a living. Villarreal replied, "What do you mean, what do I do?" Then Ruben Martinez said, "Well, I'm a jack boy. I take people's—I take people's stuff with a weapon." According to Villarreal, Ruben Martinez then said, "That's a nice vehicle." Villarreal testified that he was scared of Ruben Martinez but still went back to Gemini's room four days later. When asked how he had obtained the gun he used in the shooting, Villarreal testified he had bought it "off the street."

Villarreal was then asked about the surveillance video, which showed him and Dodd sitting in Dodd's gold SUV for a "very long time." Villarreal confirmed that he saw Ruben Martinez enter the parking lot in the green SUV. According to Villarreal, Dodd looked at him and said, "I forgot to tell you Bamm [Ruben Martinez] [is] here." Villarreal testified he replied, "Well, I mean, I want to talk to him." According to Villarreal, Dodd said, "Well, whatever happens, I mean, just like you got to—" The prosecution asked Villarreal if he really expected the jury to believe while he had his gun with him, he just happened to run into Ruben Martinez. Villarreal replied that yes, he just

wanted to talk to Ruben Martinez and get his vehicle back. Villarreal again testified that he approached Ruben Martinez who became "an immediate threat when he reache[d] for his waistband." Villarreal then admitted that Ruben Martinez never actually pulled a gun. According to Villarreal, it was enough that Ruben Martinez reached for his waistband and if the gun "fell down his pants," then "that's not up to me." The prosecutor then asked if it was possible Ruben Martinez had been just changing his shirt. Villarreal replied that Ruben Martinez "looked at [Villarreal's] face three times." The prosecutor asked if Villarreal decided "after those three looks" to shoot Ruben Martinez. Villarreal replied, "As I said, he reached for his waistband." When asked if he saw a gun, Villarreal testified, "From my angle, no, but the gesture is automatic. If you reach for your waistband and I know you got a gun or I know you had a gun because you held me at gunpoint already, I mean— " The prosecutor then asked Villarreal which of the nineteen gunshots was self-defense. Villarreal replied, "The first one." Villarreal was then asked to explain the other gunshots. Villarreal responded, "Well, from what I believe—I mean, so, I'm shooting and he's running. If I'm not—if I'm not mistaken, the law says that—right, no retreat law, you go the—" Villarreal was asked if he was shooting to kill Ruben Martinez. Villarreal replied,

> From the—okay. So, when he went for his waistband, there was no point. I—I shot. And then like I said, on the video, you'll see where I'm backing up and he starts doing this—he's—you said I couldn't speak so I said, "conversation." He already went for his waistband. He gots [sic] my driver's license. He gots [sic] the—those are my family. That's my family's house.

Villarreal reiterated that he went to confront Ruben Martinez because Villarreal wanted his vehicle back.

After hearing all the evidence, the jury found Villarreal guilty of murder and implicitly rejected his self-defense claim.

**ADMISSIBILITY OF EVIDENCE**

Villarreal argues that the trial court abused its discretion in sustaining the State's objections to certain statements he made during his testimony. We review a trial court's ruling on the admissibility of evidence for abuse of discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

Villarreal first argues that during his direct examination, the trial court abused its discretion in not permitting him to testify that the complainant said he was a "jack boy." Specifically, Villarreal points to the following testimony during his direct examination when he was testifying about his first meeting with Ruben Martinez:

> Q: And what was the essence of the conversation about?
> A: So, as we are talking, he says, "So what do you do," and I'm looking at him—
>
>> State: I'm going to object to hearsay.
>> Court: Sustained.
>
> Q: Without telling us the exact contents of the conversation, what was the conversation about?
> A: He said he's a jack boy—
>
>> State: Objection, hearsay.
>> Court: Sustained. Sustained.

The State argues that Villarreal failed to preserve this issue because he did not make an offer of proof. We agree with the State that Villarreal failed to preserve this issue.

To preserve error regarding the trial court's exclusion of evidence, the substance of the excluded evidence must be shown by an offer of proof unless the substance is apparent from the context of the questions asked. *See* TEX. R. APP. P. 33.2; TEX. R. EVID. 103(a)(2); *Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009); *Kamanga v. State*, 502 S.W.3d 871, 877 (Tex. App.—Fort Worth 2016, pet. ref'd). Here, defense counsel made no offer of proof as to what Villarreal would have testified. The most we can glean from this testimony is that Villarreal wanted

to testify that Ruben Martinez said he was a "jack boy." Even if we were to assume the trial court

erred in sustaining the State's hearsay objection to Villarreal's statement that Ruben Martinez said

he was a "jack boy," this statement is cumulative of other testimony. Later during cross-

examination, Villarreal testified about the same initial meeting with the complainant:

> Q: And so, that's when you said that [Ruben Martinez] described himself as a jack boy, right?
> A: Yes, he—he says—he says, "What do you do?" And I'm like, "What do you mean, what do I do?" He says, "Well, I'm a jack boy. I take people's—I take people's stuff with a weapon." And then so I said—
> Q: And so, you're—I mean—
> A: Okay.
> Q: —you can't possibly be telling this jury that Bamm [Ruben Martinez] told you, "I take people's stuff with a weapon?"
> A: I mean, why would he—
> Q: He says he's a jack boy.
> A: That's what a jack boy is.
> Q: Right, but he's not over there going, "Hey, I used a deadly weapon to commit these crimes," right?
> A: I mean—
> Q: Okay. So—
> A: (Laughing.) Come on now. This is—I mean . . .
> Q: Now, you know that now you know it's—if you didn't know before, that this is a motel that has narcotics in it and has people who are self-identifying as aggravated robbers and this is a place that you come back to, correct?
> A: Well, I'm not going back to the people; I'm going to [Gemini].
> Q: And at this point, do you know that Bamm [Ruben Martinez] and Gemini have a connection?
> A: Okay. So, at this—at the point they—he's—he says—we're in the stair—we are in the platform on the stairs, and so he says—when he says that, he mentions a jack boy, and he says, "That's a nice vehicle." And I said, "Which one?" He said, "The red one—"

Thus, Villarreal was able to testify about Ruben Martinez calling himself a "jack boy" during their

first meeting. Additionally, Whispeny Dodd testified that Ruben Martinez was known as a "jack

boy." She further testified that a "jack boy" is a person who robs and steals from everyone. When

asked why Ruben Martinez scared her so much, she testified that Ruben Martinez "was always

going around waving guns and then had a gun and faced it towards where my daughter was in the

hotel room." Thus, Villarreal cannot show he has been harmed by any error in excluding the statement. *See Huff v. State*, 897 S.W.2d 829, 838 (Tex. App.—Dallas 1995, pet. ref'd) (holding that appellant could not have been harmed from the trial court's ruling excluding "testimony relating to Lewis's statements to employees placing the blame for company business losses on appellant" because the same testimony came into evidence later without objection).

Villarreal next complains that the trial court abused its discretion in sustaining the State's objection when he testified to the following during direct examination:

> Q: What happens next?
> A: Gemini comes back into the room.
> Q: Then what happens?
> A: She's like giggling or whatever –
>
>     State: Objection, hearsay.
>     Defense: Don't say what she says.
>     Court: Sustained.
>
> A: Okay.
> Q: Was there a conversation?
> A: There was a conversation.
> Q: What happened after the conversation?
> A: There's a knock at the door.
> Q: What happened next?
> A: She goes and opens the door.

In his brief, Villarreal argues that he attempted to testify to the mental state of Gemini by stating she was "giggling." According to Villarreal, Gemini's "giggling" happened immediately before Ruben Martinez and his companions robbed Villarreal at gun point. Thus, Villarreal argues that "[i]t is clear that Gemini was giggling because she knew what was about to happen." We disagree with Villarreal that the record is clear in this regard. Villarreal made no offer of proof at the time the trial court sustained the State's objection, and the substance of what Villarreal contends the testimony was intended to show is not apparent from the context of the questions asked at trial.

Thus, we hold Villarreal failed to preserve error for appeal. *See* Tex. R. App. P. 33.2; Tex. R. Evid. 103(a)(2); *Holmes*, 323 S.W.3d at 168; *Kamanga*, 502 S.W.3d at 877.

Finally, Villarreal argues the trial court abused its discretion in sustaining the State's objection during his cross-examination:

> Q: I want to ask you --
> A: And I'm just saying --
> Q: --if were you shooting to kill him?
> A: From the -- okay. So, when he went for his waistband, there was no point. I -- shot. And then like I said, on the video, you'll see where I'm backing up and then he starts doing this—he's -- you said I couldn't speak so I said, "conversation." He already went for his waistband. He gots [sic] my driver's license. He gots [sic] the -- those are my family. That's my family's house. This dude, you seen what he posted on Facebook about pistol whipping women and this and that.
>
> State: Objection, Your Honor, this is completely outside the realm of testimony. I would ask that the jury be instructed to disregard stuff that the witness just said.
> Court: Okay. Sustained. The jury is instructed to disregard the last comment. And please don't talk over each other.
> Williams: I'm sorry, ma'am.
> Court: Answer only the questions being asked.
> Williams: I'm sorry. I'm sorry, Jury. I'm sorry, everybody. I apologize.
>
> Q: You made a choice—
> A: Yes, I did.
> Q: -- when you walked down there to approach him in a location where he was unable to leave, correct?
> A: I mean, I don't know if he—there was a—okay, so how you word it is—I mean, I approached him—
> Q: Sir, just answer my question. Did you approach him in a location where he couldn't leave?
> A: I approached him, and he had every opportunity to leave.
> Q: So did you, right?
> A: Yes. But I wanted my vehicle.
> Q: You could have turned around and never had anything to do with him, right?
> A: But I wanted my vehicle.
> Q: But you went back there carrying that gun 'cause you had a purpose, right?
> A: I went to confront him about my vehicle.

Villarreal argues on appeal that Ruben Martinez's Facebook post showed Ruben Martinez's "mental tendencies towards violence and criminal activity." However, the record reflects that the State objected to Villarreal's answer being beyond the scope of the State's question, which it was. Thus, we find no abuse of discretion by the trial court in sustaining the above objection.[1]

### RIGHT TO COMPULSORY PROCESS OF WITNESS

Villarreal next argues that his Sixth Amendment right to compulsory process was denied when the trial court did not compel witness Jesse Munoz to testify. "The Sixth Amendment right to compulsory process 'is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.'" *Coleman v. State*, 966 S.W.2d 525, 527 (Tex. Crim. App. 1998) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)). "The Sixth Amendment does not guarantee, however, the right to secure the attendance and testimony of any and all witnesses; rather, it guarantees only compulsory process for obtaining witnesses whose testimony would be both material and favorable to the defense." *Id*. at 527-28. To be entitled to compulsory process, the defendant bears the burden to make a "plausible showing of how [the witness's] testimony would have been both material and favorable to his defense, . . . in ways not merely cumulative to the testimony of available witnesses." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 873 (1982); *see also Coleman*, 966 S.W.2d at 528 (noting burden of showing materiality and favorableness is placed on the defendant); *Torres v. State*, 424 S.W.3d 245, 262 (Tex. App.–Houston [14th Dist.] 2014, pet. ref'd) (noting defendant carries the burden to show testimony would be material and favorable). "A defendant who has not had an opportunity to interview a witness may make the necessary showing

---

[1]We note that at trial, Villarreal did attempt to introduce an exhibit of another Facebook post by Ruben Martinez where he is holding a gun. The court excluded the exhibit because it did not think that Whispeny Dodd was the right sponsor for the piece of evidence. In his brief, Villarreal does not argue that the trial court erred in excluding this exhibit.

by establishing the matters to which the witness might testify and the relevance and importance of those matters to the success of the defense." *Coleman*, 966 S.W.2d at 528. "Were the burden of showing materiality and favorableness not placed on the defendant, 'frivolous and annoying requests [c]ould make the trial endless and unduly burdensome on the Court and all officers thereof.'" *Id*. (quoting *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983)).

"We review complaints concerning limitations on the right to compulsory process under an abuse-of-discretion standard." *Lawal v. State*, 368 S.W.3d 876, 886 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A trial court abuses its discretion when a party shows clear evidence or agreed facts that the testimony in question would be material and favorable to the defense. *Torres*, 424 S.W.3d at 262 (citing *Coleman*, 966 S.W.2d at 528). "Under the Compulsory Process Clause, evidence is material 'only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact.'" *Freeman v. State*, 413 S.W.3d 198, 205-06 (Tex. App.— Houston [14th Dist.] 2013, pet. ref'd) (quoting *Valenzuela–Bernal*, 458 U.S. at 874). "Accordingly, a defendant does not have a right to compulsory process for testimony that is 'incompetent, privileged or otherwise inadmissible under standard rules of evidence.'" *Id*. (quoting *Taylor v. Illinois*, 484 U.S. 400, 410–11 (1988)). Further, the testimony cannot merely be cumulative to the testimony of available witnesses. *Valenzuela–Bernal*, 458 U.S. at 867, 873.

Villarreal has failed to show that Jesse Munoz's testimony was material and not cumulative of other testimony. In his offer of proof, Villarreal's trial counsel stated that Jesse Munoz would have testified that Ruben Martinez's "reputation for truthfulness [was] very bad" and that his reputation was not one of a "law-abiding citizen" or "a peaceful person" but was instead as "a violent person." This offer of proof, however, is cumulative of testimony given by Whispeny Dodd who testified that Villarreal was "a good person" and Martinez "was scaring a lot of people,

waiving guns and shit around." Dodd further testified that Martinez, was known as "a jack boy." Dodd explained a "jack boy" was someone who stole and robbed others. She testified that the week before the shooting, Villarreal had been set up by Martinez and Gemini, and that Martinez had robbed Villarreal. Dodd testified that it appeared other people "took orders" from Martinez. Because Dodd's testimony was cumulative of Villarreal's offer of proof, Villarreal did not meet his burden of showing Jesse Munoz's testimony was material. *See Valenzuela–Bernal*, 458 U.S. at 874; *Freeman*, 413 S.W.3d at 205-06.

Moreover, "the Compulsory Process Clause does not include the right to compel a witness to waive the Fifth Amendment right against self-incrimination." *Navarro-DePaz v. State*, 689 S.W.3d 19, 28 (Tex. App.—San Antonio 2024, pet. ref'd). A "defendant's right to present evidence must yield to the opposing Fifth Amendment privilege against self-incrimination if the witness has a legitimate fear of possible incrimination." *Id*. (citing *Walters v. State*, 359 S.W.3d 212, 215-16 (Tex. Crim. App. 2011)). When the defense called Jesse Munoz as a witness, the prosecution informed the trial court that Munoz "need[ed] a lawyer," stating that Munoz could not "get on the [witness] stand without representation" because Munoz allegedly had "tampered with evidence in a murder investigation." Counsel was immediately appointed for Munoz, and Munoz's appointed counsel reported to the trial court that (1) he had just conferred with Munoz, and (2) Munoz will not testify and intends to invoke the Fifth Amendment. Villarreal's counsel argued that he did not intend to ask Munoz questions about his criminal involvement but only about Martinez's reputation. Outside the presence of the jury, Munoz was called to the witness stand and Villarreal's counsel asked whether Munoz was present during the December 22, 2022 shooting. Munoz replied, "I was in the vicinity, yeah," explaining that he had been inside one of the hotel rooms. Villarreal's counsel then asked whether Munoz knew Ruben Martinez's "reputation for

truthfulness in the community." Munoz replied, "No." Villarreal's counsel asked whether Munoz knew Ruben Martinez's "reputation for law abidingness in the community." Munoz replied, "No." Villarreal's counsel then turned to the trial court, arguing that Munoz was lying and that Munoz had told him earlier he had known Ruben Martinez well. The prosecutor stated that Munoz had said he knew Ruben Martinez, but that Munoz had not been under oath for that statement and that Munoz had invoked his Fifth Amendment right. The trial court reiterated that it did not "see the purpose of [Munoz]'s testimony" and allowed the defense to make an offer of proof.

From this record, we find no abuse of discretion by the trial court. When the defense called Munoz as a witness, the State indicated Munoz could be charged with tampering with evidence in a murder case. Munoz's court-appointed lawyer informed the trial court that Munoz intended to invoke his Fifth Amendment right. *See Suarez v. State*, 31 S.W.3d 323, 329 (Tex. App.—San Antonio 2000, no pet.) (stating that the advice to the defendant "by his legal counsel relieved the trial court of the obligation to make any further determination of whether [the defendant's] assertion of the [Fifth Amendment] privilege was valid"). This record is devoid of any evidence that Munoz claimed his privilege under the Fifth Amendment in bad faith. *See id*. "Once the potential witness indicates that he will invoke his constitutional privilege, the court need not call him to the stand before the jury." *Id*. "A defendant does not have the right to have a witness invoke the Fifth Amendment privilege in the presence of the jury." *Id*. Therefore, we hold the trial court did not abuse its discretion in preventing Villarreal from calling Munoz as a witness.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, Villarreal argues that he was denied ineffective assistance of counsel when his trial counsel did not object to a video being introduced into evidence that mentioned Villarreal having

a "blue warrant."[2] We measure a claim of ineffective assistance of counsel against the two-prong test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See Hernandez v. State*, 726 S.W.2d 53, 55-57 (Tex. Crim. App. 1986) (applying *Strickland* test). A person claiming that counsel was ineffective must prove, by a preponderance of the evidence, that (1) counsel's performance was deficient, falling below an "objective standard of reasonableness," and (2) the deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012) (citing *Strickland*, 466 U.S. at 694). Further, we "indulge in a strong presumption that counsel's conduct fell within the wide range of reasonable assistance and that the challenged action might be considered sound trial strategy." *Id.* (citation omitted). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel." *Id.* "The *Strickland* test is judged by the 'totality of the representation,' not by counsel's isolated acts or omissions, and the test is applied from the viewpoint of an attorney at the time he acted, not through 20/20 hindsight." *Id.* Thus, "[a]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

"Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decisionmaking as to overcome the presumption that counsel's conduct was reasonable and professional." *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). "[R]arely will the trial record contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation."

---

[2]A blue warrant is issued for parole revocation. *See Ex parte White*, 400 S.W.3d 92, 93 (Tex. Crim. App. 2013)

*Id.* "[I]n the majority of cases, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel." *Id*. (quoting *Thompson*, 9 S.W.3d at 813). "Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (citation omitted). "If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it." *Id.* (citation omitted).

Here, Villarreal claims his trial counsel admitted his deficiency when after the video in question was published to the jury, his trial counsel objected to the portion of the videotape that mentioned Villarreal's blue warrant, was told that his objection was untimely, and then stated, "They're going to shoot me at the appellate court and my client is going to crucify me if this doesn't go right." According to Villarreal, his trial counsel "either failed to review video evidence that the State intended to introduce to the jury or forgot that the video contained information concerning [Villarreal]'s blue warrant [and Villarreal being] on parole during [his] detention in this matter."

When the State moved to introduce the video in question, State's Exhibit 70, Villarreal's trial counsel approached the bench to confirm that (1) the video contained only audio and did not show Villarreal in handcuffs inside the jail, and (2) the video did not include Villarreal's request of an attorney. After the video was published, Villarreal's counsel requested the jury leave the courtroom and then moved for a mistrial.

> DEFENSE: Well, the Government represented to Smith, the attorney for my client, that's me, that they were only playing so much of it. We talked about this, and the incident of parole warrant was never mentioned. I thought the tape was going to be cut off before then, and that is highly prejudicial.

STATE: Your Honor, we've discussed extensively, and when the Defense said that he elected to try them together [the murder charge and the charge for being a felon in possession of a firearm], and I asked, "then it's all going to come in," and that was the indication that it was all coming in. Now, the fact that there's a blue warrant, he's a felon in possession. And the fact that he has a warrant goes to his whole story, right, like why he couldn't call, right? And Mr. Smith has repeatedly represented to the State that it was all coming in. So, I'm not sure why we're shocked now that it's coming in. This is well before where the tape gets cut off.

DEFENSE: To get blindsided by that statement in a tape where they know that that's not the issue they're trying before the Court, the Court issue is felon in possession and murder. There's a—we talked extensively yesterday about the tape with the mention of the aggravated assault in the five or six minutes and the statements the Court ruled were there. But I have to claim and I do claim that that was not the gist of the argument.

When asked by the trial court whether he had listened to the audio, defense counsel confirmed that he had when he had done his investigation and had taken extensive notes. In arguing to the trial court that a mistrial should be granted, defense counsel stated that he was under the assumption that any reference to the blue warrant had been omitted.

Emphasizing that it is Villarreal's burden to show deficiency, the State argues on appeal that this record is not sufficient to show that Villarreal's trial counsel's "representation was so deficient and so lacking in tactical or strategic decisionmaking as to overcome the presumption that counsel's conduct was reasonable and professional." *Bone*, 77 S.W.3d at 833. According to the State, the "record at most shows that [defense] counsel and the State didn't have a meeting of the minds over what redactions were requested and completed." In reviewing the record, we agree with the State. This record does not overcome the strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance. *See id*.

Moreover, in his brief, Villarreal has not articulated any prejudice that he suffered as a result of the mention of the blue warrant in the video. We note that the record reflects the trial

court gave the jury a limiting instruction on several occasions during the trial. *See Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009) (holding that even if the witness's reference to the defendant, who was on trial for capital murder, being seen "in a Crime Stoppers on an unrelated shooting that occurred like the following weekend" was improper, the trial court gave a limiting instruction and "[n]othing in the record suggest[ed] that the jury was unable to follow the instruction"); *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992) ("It is well-settled that testimony referring to or implying extraneous offenses can be rendered harmless by an instruction to disregard by the trial judge, unless it appears the evidence was so clearly calculated to inflame the minds of the jury or is of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind."). The references to the blue warrant were brief and vague. Further, at the time the video was published to the jury, the jury had already heard the allegation that Villarreal was a convicted felon due to his charge for being a felon in possession of a firearm. Lastly, Villarreal took the witness stand and testified about much extraneous conduct, including charges for robbery, burglary of a habitation, aggravated robbery, and possession of a controlled substance. He admitted to having resided in the penitentiary "two times." He also testified that he was on parole on December 22, 2022. He admitted to cutting his ankle monitor in the summer of 2022, which was the reason he had a blue warrant. He explained that because of his warrant, he did not call the police after he was allegedly robbed by Martinez, stating that if he called the police, he would have gone back "to jail." Therefore, we conclude the record does not show that the reference to the blue warrant in the video prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Jimenez*, 364 S.W.3d at 883.

**CONCLUSION**

Having found no abuse of discretion by the trial court in its evidentiary rulings and having concluded the record does not support Villarreal's allegation of ineffective assistance of counsel, we affirm the judgment of the trial court.

Adrian A. Spears II, Justice

DO NOT PUBLISH