# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00101-CR

**Nathaniel Pearson, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 20-0399-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Nathaniel Pearson entered an open guilty plea to the third-degree felony offense of online impersonation. *See* Tex. Penal Code § 33.07(a). Following a punishment hearing, the trial court sentenced him to eight years' confinement. In two issues on appeal, he contends that the trial court "prevented his defense" by denying him "the opportunity to present expert evidence about his mental health issues" and that defense counsel was ineffective for failing to designate Pearson's psychiatrist, Dr. Robert Cusser, as an expert before the punishment hearing. We affirm the trial court's judgment of conviction.

## BACKGROUND

The State's witnesses for the punishment hearing in January 2024 included Hutto Police Department Officer Scott Mattingly; Samantha Roy, the victim of the charged offense and Pearson's former coworker; Cindy Gervasi, Samantha's mother; Austin Police Department (APD) Officer George Chavez; APD Detective Shaun Donovan; and Melinda Wilkins, Pearson's

ex-girlfriend and the victim of offenses for which charges were pending against him in Travis County.[1] The defense presented testimony from Dr. Cusser and from Pearson's mother, Fatima Pearson, who was appointed his legal guardian in 2023, when Pearson was around twenty-three years old. The trial court took judicial notice of its case file and admitted into evidence hundreds of photographs and screenshots of harassing posts and messages made and sent by Pearson to Samantha; Melinda; and Jessilynn Kokason, another of his ex-girlfriends. Also admitted were the court order appointing Fatima as Pearson's guardian; a certificate of medical examination (CME) completed by their family physician, Dr. Radha Mahale; and a competency evaluation authored by Dr. Maureen Burrows, who found Pearson competent to stand trial.

According to testimony from Samantha, Melinda, and the members of law enforcement, Pearson, who was twenty-three at the time of trial, created dozens of fake social media accounts—some in Samantha's, Melinda's, and Jessilynn's names—on which he posted intimate, graphic, and obscene content of the three women and from which he bombarded them with vulgar and threatening messages, including threats of rape and death as well as evidence of stalking. Pearson uploaded child pornography of Melinda, directed people to her home to have sex with her, and tagged posts of pornographic videos and photographs with her address and the names of her friends and family members. Both Samantha and Melinda testified that Pearson violated protective orders that they had obtained against him, that his abusive behavior continued after he was arrested and released on bond, and that he had targeted their friends. Gervasi testified about the "horrible" psychological effects of the abuse against Samantha. Melinda testified that she would never be able to heal and that Internet searches of her name still returned results

---

[1] Because Melinda was a minor at the time of the offenses, we refer to her using a pseudonym in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

featuring the child pornography. She also testified that Pearson was a manipulative liar, that he was "unsafe for people" and would "do this again," and that she did not think he regretted his actions. At the hearing's conclusion, the trial judge remarked that in her nine years on the bench, she had not seen an online-impersonation case "that was so detailed, so involved, vile, disturbing, and testing the limits of the sanity of the recipient[s] of those messages. It's bad."

During the plea hearing in November 2023, defense counsel requested that Dr. Cusser be allowed to testify remotely. The State, which had previously filed a motion for discovery of the defense's expert witnesses, agreed to the remote testimony so long as counsel provided a copy of any report authored by Dr. Cusser in advance of the punishment hearing.[2] Counsel replied that he would try to get any medical records "rendered by the doctor . . . ahead of time."

At the beginning of the punishment hearing, counsel notified the trial court that he had subpoenaed Dr. Cusser but had not received his resume or "any formal reports." Counsel explained that he had been in contact with the legal department of Baylor Scott & White, with which Dr. Cusser was affiliated, and had learned that while Dr. Cusser was available to testify, he was "hesitant" to do so; counsel's "best efforts to obtain any more information from him were not addressed." Counsel "couldn't force him or his legal department . . . to provide any more information" despite attempting to do so the day before.

Counsel added that he intended to have Dr. Cusser testify "as to diagnosis, his treatment plan, things like that." Counsel disclaimed any interest in eliciting testimony with respect to "whether Mr. Pearson is a good or bad candidate for probation" and was focused on

---

[2] The defense did not submit a list of its anticipated experts in advance of the hearing, and the trial court did not rule on the State's motion for discovery of the defense's expert witnesses.

"just establishing that [Pearson] is in treatment and he has been in treatment and why has he been in treatment." In other words, counsel stated, "I need [Dr. Cusser] to let the [c]ourt know that he's treating [Pearson] for some mental illnesses, and that's relevant."

Counsel agreed with the trial court that he was seeking to have Dr. Cusser testify only as a fact witness. While counsel noted that he might have sought to qualify Dr. Cusser as an expert had counsel received a report before the hearing, he stated that he was not calling Dr. Cusser as an expert because counsel did not know what the substance of Dr. Cusser's expert testimony would be.

Against the State's initial reluctance to agree to Dr. Cusser's virtual testimony without his having submitted a report, the trial court asserted that counsel's desired testimony did not require an expert opinion and underscored the fact that the testimony's subject was already well known to the court:

> Is that not something that's been a core issue of this case for the at least four years that it's now been pending, that this—[Pearson] has mental health issues, there's a guardianship pending, he has a diagnosis? This is no secret. I've been told this at least a dozen times. I don't understand what the issue is.

Ultimately, both parties assented to "limiting [Dr. Cusser's] testimony to he's the treating [psychiatrist], this is his diagnosis, this is the course of treatment."

Dr. Cusser, who had not previously testified in a trial, testified about his treatment of Pearson, whom Dr. Cusser began seeing in 2020. He typically saw Pearson every three months, although "[t]here have been one or two times that it's pushed to closer to five." When asked for the focus of his treatment plan and what he and Pearson were "addressing," Dr. Cusser answered only, "So I manage medications, and he's being treated with medications." Pearson had told Dr. Cusser that he was tolerating and benefitting from his current medication, and he had been

4

"stable" for around a year. Asked about "the future plan" for Pearson's treatment, Dr. Cusser replied that the current medication regimen and Pearson's therapy—which was overseen by a different specialist—would continue. Dr. Cusser had not noticed any problems, and Pearson had been "pretty steady" and had consistently attended their appointments. Regarding Pearson's improvement during treatment, Dr. Cusser testified, "I've heard from him that he's been more calm and levelheaded and not as irritated, and he's been telling the truth. There was some concern about whether or not he was going to school or not, but he seems to be telling the truth as well."

Fatima also testified about her son's mental health. Pearson had been largely nonverbal until he was four years old and had difficulty with social interactions at school. As a child, he had shown signs that he had anxiety, depression, and Oppositional Defiant Disorder (ODD) but had not received a formal diagnosis despite seeing therapists. The ODD involved his "being resistant to doing what you're telling him to do." After he had "an issue" in 2017, he was "evaluated" and diagnosed with ODD, depression, and anxiety.[3] Around the same time, "he was mandated to a partial hospitalization for mental health treatment." Fatima followed Dr. Cusser's advice and applied for legal guardianship of her son in 2022 to better supervise him. Dr. Mahale, the family physician, evaluated Pearson during the application process, and "the results indicated that Nathaniel has several issues related to his mental capacity."

Since Pearson began seeing Dr. Cusser, Fatima had noticed "a big difference"; Pearson was "more in control" and "able to focus." Before beginning his current medication, he would become upset and have "outbursts" in which his entire body would go numb. He was "uncontrollable," had "tunnel vision," and wanted "to go after whoever it was that made him

---

[3] The issue was Pearson's harassment of Jessilynn and subsequent adjudication of delinquency in Delaware.

upset." According to Fatima, Dr. Cusser thought that Pearson was "kind of out of it when those things kind of happen." Pearson had not had any outbursts or issues since beginning his medication. Dr. Cusser had informed her that Pearson would eventually be able to work or continue college.

Pearson's mental health was likewise addressed in both the CME and competency evaluation. Among Pearson's diagnoses, the CME listed autism, dyslexia, Oppositional Defiant Behavior, and Bipolar Disorder. Next to "Severity," Dr. Mahale checked the box for "Moderate"; she gave his prognosis as "fair." In the field for "Treatment/Medical History," she wrote "medications through psychiatry." She checked boxes indicating that he suffered from intellectual disability and developmental disability. In a section titled "Determination of Intellectual Disability," Dr. Mahale checked a box next to the statement, "I examined the proposed ward in accordance with rules of the executive commissioner of the Health and Human Services Commission governing Intellectual Disability examinations, and my written findings and recommendations include a determination of an intellectual disability." She also checked boxes indicating that Pearson had a "[m]ild" IQ of approximately fifty to seventy and that there was evidence that his intellectual disability originated during his developmental period.

In Dr. Burrows's competency evaluation, she noted that she had reviewed Pearson's mental-health records and psychological evaluations and listed his diagnoses as Major Depressive Disorder, Dependent Personality Disorder with Antisocial and Borderline features, Generalized Anxiety Disorder, dyslexia, Math Disorder, and average overall intelligence. She also noted that he had received both outpatient and inpatient care and had a history of self-harm.

At the hearing's conclusion, the trial court informed the parties that it was "troubled" by the fact that Dr. Mahale had completed Pearson's guardianship evaluation, adding,

6

"And I'm not saying that that was improper because . . . the state's code allows. However, that doctor should have experience examining individuals with physical and mental health conditions resulting in incapacity. So I have questions about that."

Before sentencing Pearson, the trial court explained its reasoning:

> I respect [the guardianship] order and I respect the proceedings of the [c]ourt in that regard. However, I have a lot of questions. Did those people know about your actions in these cases? Dr. Burrows found you competent. Dr. Burrows read all of the records that are referenced in [the guardianship application]. Dr. Burrows does not diagnose you nor repeat that you've been diagnosed as—with intellectual disability, yet the guardianship document indicates that you have an intellectual disability.
>
> So there are a lot of contradictions, and I am certainly not a doctor. I'm not a mental health expert, but I have for five years now presided over a felony mental health docket and work hand in hand with mental health providers. And it is certainly concerning to both the State, all the participants in a court proceeding that someone has mental health issues. I think as a society we've evolved to a point where we look at mental health issues and take them very seriously and want to determine what's the nexus between a mental health issue and criminal behavior.
>
> Mr. Pearson was not insane at the time he committed these offenses. He's competent to stand trial. He does have a diagnosis, yes, but you can't really reconcile the behavior and the actions that he committed with, because he has mental health issues, the consequences should be less. It is very difficult . . . . And at the end of the day, yes, this is about what punishment is appropriate. There are so many factors to consider, and the safety of the community is one of them.

The court sentenced Pearson to eight years' confinement. Although he filed a motion for new trial, it was not accompanied by any sworn affidavits and was overruled by operation of law. This appeal followed.

**DISCUSSION**

**I.      Exclusion of Expert Testimony**

In his first issue, Pearson contends that he "should have had the opportunity to present expert evidence about his mental health issues" and that the trial court's excluding such evidence "prevented his defense." Specifically, he argues that the trial court abused its discretion by excluding "expert testimony as to how [Pearson's] mental health issues affected the mens rea of the offense with which he was charged" because the court's ruling "robbed [him] of his defense" and because "[i]t is not at all clear that his diagnosis would not have reconciled with his behavior if expert testimony about how his diagnosis affects behavior was allowed." The State responds that the issue was not preserved and that Pearson's guilty plea waived any defensive issues as to his guilt.

To preserve a complaint for appellate review, there must ordinarily be a timely, specific objection and a ruling by the trial court. Tex. R. App. P. 33.1(a). "To be timely, a complaint must be made as soon as the grounds for complaint [are] apparent or should be apparent." *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999). To be sufficiently specific, an objection need not employ "hypertechnical or formalistic . . . words or phrases," *Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018); "magic words," *Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009); or a citation to a particular statute, *Laws v. State*, 640 S.W.3d 227, 229 (Tex. Crim. App. 2022) (quoting *Ford*, 305 S.W.3d at 533). Rather, the objecting party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009).

8

"This gives the trial judge and the opposing party an opportunity to correct the error." *Id.* (citing *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005)).

To preserve error regarding the exclusion of testimony, a defendant must also make an offer of proof under Texas Rule of Evidence 103. *See* Tex. R. Evid. 103(a)(2) (party may claim error in ruling to exclude evidence only if error affects party's substantial right, and party informs court of evidence's substance "by an offer of proof, unless the substance was apparent from the context"). The offer of proof may be in the form of a concise statement by counsel, or it may be in question-and-answer form. *Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009). If in the form of a statement, the proffer "'must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible.'" *Id.* (quoting *Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998)). The proffer must extend "beyond the anticipated questions" that the complaining party intends to ask the witness and reveal, "with some degree of specificity, the substantive evidence [the complaining party] intended to present." *Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009). "The primary purpose of an offer of proof is to enable an appellate court to determine whether the exclusion was erroneous and harmful. A secondary purpose is to permit the trial judge to reconsider his ruling in light of the actual evidence." *Id.* (quoting Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, 1 *Texas Practice–Guide to the Texas Rules of Evidence: Civil and Criminal* § 103.3 (1993)).

We agree with the State that Pearson's first issue was not preserved for appellate review for the simple reason that defense counsel did not attempt to have Dr. Cusser testify as an expert. There was some initial confusion regarding counsel's anticipated questioning, as evidenced by the following exchange, which occurred before the punishment hearing:

9

THE COURT:  Is he a fact witness or an expert?

DEFENSE COUNSEL:  Well, he—he's Mr. Pearson's treating psych[iatrist], so—

THE COURT:  Okay.

DEFENSE COUNSEL:  —both.  I mean, I really don't know that he'd want to testify to the facts, but he can definitely testify as to diagnosis, his treatment plan, things like that, and that was my intent on calling him.  In my opinion, you know, some of that would be his expert opinion.  I'm not necessarily asking him to give an opinion on the outcome of the case, and I know that that was an issue that he was having, that he was worried that he would be, you know, asked to give an opinion on that.

The trial court attempted to clarify the scope of Dr. Cusser's testimony by asking whether he was going to opine as to Pearson's suitability for probation or whether he was "just going to simply say as a fact witness, [']I'm his treating doctor; his diagnosis is X; his treatment plan is X?[']  Because that—those are two different things."  Counsel answered that he had not spoken with Dr. Cusser and did not know what the substance of any expert testimony would be.  It then became clear that counsel intended to call Dr. Cusser as a fact witness:

THE COURT:  It sounds to me like he's an expert [in] that he's a doctor, but he's not being called for the purposes of an expert witness.  He's going to be a—he's a fact witness.

DEFENSE COUNSEL:  I'm not going to ask him—I can just tell everyone here now and I would have told him, I don't need him to tell me or the Court whether Mr. Pearson is a good or bad candidate for probation.  I need him to let the Court know that he's treating him for some mental illnesses, and that's relevant.

THE COURT:  So those are facts—

DEFENSE COUNSEL:  Right.  And I understand that.

THE COURT:  —and they're not expert opinion.

The court asked if the parties agreed to limit Dr. Cusser's testimony to "he's the treating, this is his diagnosis, this is the course of treatment," and counsel replied, "I agree. That's—I mean, I'm fine with that."

At no point did counsel request to have Dr. Cusser testify as an expert, and the trial court never issued a ruling adverse to counsel during the discussion about the scope of Dr. Cusser's testimony. *See Ex parte Covarrubias*, 665 S.W.3d 605, 611–12 (Tex. Crim. App. 2023) ("It is axiomatic that an adverse ruling is necessary to preserve error."). To the contrary, the court allowed the precise scope of questioning sought by counsel.

What is more, counsel did not make an offer of proof concerning the substance of any expert testimony that Dr. Cusser would have offered, and the testimony's substance was not apparent from context. Although counsel previewed Dr. Cusser's *fact-witness* testimony for the trial court, counsel admitted that he did not know how Dr. Cusser would testify if called *as an expert*; it was for exactly that reason—and the related fact that Dr. Cusser had not provided a report—that counsel stated he was not going to ask for Dr. Cusser's expert opinion:

> THE COURT:  So you're not calling him as an expert, then—
>
> DEFENSE COUNSEL:  I don't—
>
> THE COURT:  —because you don't know what he's going to say.
>
> DEFENSE COUNSEL:  I really don't.  I really don't, but certainly he can testify as to the treatment plan that Mr. Pearson has been on and, possibly, how he's doing.

Because counsel did not know what Dr. Cusser's expert testimony would have been, it follows that counsel could not have made an offer of proof regarding the testimony and that the testimony's substance could not have been gleaned by context. Accordingly, given counsel's failure to secure an adverse ruling or to make an offer of proof, no error concerning

11

expert testimony from Dr. Cusser was preserved for appellate review. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(2). We overrule Pearson's first issue.

## II.      Ineffective Assistance of Counsel

In his second issue, Pearson contends that defense counsel was ineffective for failing to designate Dr. Cusser as an expert before the punishment hearing. Pearson argues that "[e]xpert testimony might have given the trial court the ability to consider whether [his] actions were consistent with his diagnosis"; that the absence of such testimony prejudiced his defense "to some extent"; and that if Dr. Cusser had testified as an expert, "there may have been a very different result." The State argues that counsel's decision not to call Dr. Cusser as an expert was strategic because counsel did not know whether Dr. Cusser would cooperate or what the substance of his testimony would have been. The State also argues that Pearson has failed to demonstrate prejudice through his "mere speculation about the possibility of a different outcome had he taken different strategic risks."

To establish ineffective assistance of counsel, an appellant must demonstrate by a preponderance of the evidence both deficient performance by counsel and prejudice suffered by the appellant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018). The appellant must first demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, *Strickland*, 466 U.S. at 687–88; *Ex parte Scott*, 541 S.W.3d 104, 115 (Tex. Crim. App. 2017), and then show the existence of a reasonable probability—one sufficient to undermine confidence in the outcome—that the result of the proceeding would have been different absent counsel's deficient performance, *Strickland*, 466 U.S. at 694; *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App.

2017). A single error will rarely result in a finding of ineffective assistance of counsel. *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700; *accord Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

Appellate review of counsel's representation is highly deferential; we must "indulge in a strong presumption that counsel's conduct was not deficient." *Nava v. State*, 415 S.W.3d 289, 307–08 (Tex. Crim. App. 2013); *see Strickland*, 466 U.S. at 689. To rebut that presumption, a claim of ineffective assistance must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). Rarely will the trial record by itself be sufficient to demonstrate an ineffective-assistance claim. *Nava*, 415 S.W.3d at 308.

Additionally, trial counsel should generally be given an opportunity to explain his actions before being found ineffective. *Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021). When "direct evidence" of counsel's deficiency is not available, "we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143. "In the face of an undeveloped record, counsel should be found ineffective only if his conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Johnson*, 624 S.W.3d at 586 (quoting *Goodspeed*, 187 S.W.3d at 392); *see also Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012) ("The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel."). "A silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance." *Johnson*, 624 S.W.3d at 586.

13

On this record, Pearson has not shown by a preponderance of the evidence that defense counsel's performance was deficient because he did not designate Dr. Cusser as an expert in advance of trial. *See* Tex. Code Crim. Proc. art. 39.14(b) (on opposing party's request, requiring disclosure of expert witnesses in writing not less than twenty days before trial). "This case falls into the category of ineffective-assistance claims raised on direct appeal for which the record is undeveloped because it does not adequately reflect counsel's reasoning." *See Hart v. State*, 667 S.W.3d 774, 783 (Tex. Crim. App. 2023). Yet despite the fact that counsel has not been given the opportunity to explain his reasoning, a strategic motivation may be apprehended. *See Lopez*, 343 S.W.3d at 143.

The Court of Criminal Appeals has explained that the designation of expert witnesses is in some respects a double-edged sword and not without risks to the defendant. "[O]nce a party designates a particular person as an expert that he may use as a witness at trial, . . . [the expert] is a 'testifying' expert, and the opposing party . . . may seek further information from or about him for use at trial." *Pope v. State*, 207 S.W.3d 352, 360 (Tex. Crim. App. 2006). A party who designates a particular person as an expert may later "decide[] that the expert's opinions and testimony could do its side more harm than good." *Id.* at 361. "The designation of a potential expert witness under article 39.14(b) is an act similar to crossing the Rubicon in that it may waive many of the protections otherwise provided by the work-product doctrine"; counsel should "investigate first, consult second, designate third." *Id.* at 365–66.

Defense counsel—despite subpoenaing Dr. Cusser and remaining in communication with Baylor Scott & White's legal department—was unable, through no fault of his own, to properly investigate and consult. Dr. Cusser did not comply with counsel's request for his resume and Pearson's medical records, and counsel admitted that he was electing not to call

Dr. Cusser as an expert because he did not know how the psychiatrist would testify. Dr. Cusser had never testified before, and counsel noted that he was hesitant to do so. Instead of eliciting unknown testimony that could have potentially proven damaging to Pearson's defense, it appears that counsel may have instead made a reasonable strategic decision to limit Dr. Cusser's testimony to describing the nature of Pearson's mental illness and treatment.

What is more, an appellant who complains about his attorney's failure to call a witness must show both that the witness was available and that the appellant would have benefitted from the witness's testimony. *See Holland v. State*, 761 S.W.2d 307, 319 (Tex. Crim. App. 1988) ("Absent a showing by appellant that he would have benefitted from the testimony, the decision not to call witnesses at either stage of trial does not raise the spectre of ineffective assistance."). Because Pearson—like defense counsel—does not know what Dr. Cusser's testimony would have revealed, he has failed to explain how he would have benefitted from the testimony. We conclude that Pearson has neither overcome the presumption that counsel's conduct was not deficient nor shown that it was so outrageous that no competent attorney would have engaged in it. *See Strickland*, 466 U.S. at 689; *Johnson*, 624 S.W.3d at 586; *Nava*, 415 S.W.3d at 307–08.

Because Pearson has not met his burden to prove *Strickland*'s first prong, we need not consider the issue of prejudice. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong."). We overrule his second issue.

## CONCLUSION

Having overruled both of Pearson's issues, we affirm the trial court's judgment of conviction.

15

_____

Maggie Ellis, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed

Filed:   January 9, 2026

Do Not Publish